88   589
a187s 28

## Joseph T. Donovan v. The Consolidated Coal Co.

1.  TRESPASS—*Liability of Aiders and Abettors.*—One who in any manner indicates his desire that an act be done, may be said to request it, and one who does anything in furtherance of an act, may be said to aid or abet it; so one who grants the right to mine and take away coal, to which he has no title, which coal is actually mined and taken away, is guilty of aiding and abetting a trespass.

2.  SAME—*Grant of Mining Rights Without Authority.*—One who assumes to grant the right to mine coal in the lands of another without right or authority to do so, is to be held responsible for all the consequences.

3.  DAMAGES — *For  Taking  Coal  Without  Authority.* — One who mines and takes away coal from the land of another, without authority, is a trespasser, and is liable for the value of the coal at the mouth of the pit, less the cost of carrying it there from the place where it has been dug, allowing him nothing for the digging.

4. EXEMPLARY DAMAGES—*When Not Recoverable.*—Exemplary damages are not recoverable in trespass against one who takes coal without authority, the purpose of the rule in such cases being to provide compensation only to the wronged one, and is intended to be sufficiently liberal to produce in all cases full compensation, not to exceed, however, the actual value of the coal taken.

**Trespass**, for taking coal. Appeal from the Circuit Court of St. Clair County; the Hon. MARTIN W. SCHAEFER, Judge, presiding. Heard in this court at the August term, 1899. Affirmed. Opinion filed March 16, 1900.

DILL & WILDERMAN and GEO. C. REBHAN, attorneys for appellant.

CHARLES W. THOMAS, attorney for appellee.

MR. JUSTICE CREIGHTON delivered the opinion of the court.

This was an action of trespass in the Circuit Court of St. Clair County, by appellee against appellant, to recover for coal mined and taken from a certain stratum of coal owned by appellee. Jury was waived. Trial was by the court without a jury. Finding and judgment in favor of appellee for $2,500 and costs.

Appellant was the owner of certain lands, comprising 24½ acres, upon and in which was situate a coal mine known as the Johnson mine. He also owned the surface of 135 acres of other land lying immediately west of the Johnson mine tract, but he did not own and never owned the coal under the surface of this 135 acres, that having been conveyed to appellee by the owner before appellant acquired title to the surface. On the 1st day of October, 1896, appellant entered into a written contract with the St. Louis & O'Fallon Coal Company, Edward L. Thomas and John F. Taylor, as follows:

" This indenture made and entered into this 1st day of October, A. D. 1896, by and between Joseph T. Donovan, of the city of St. Louis and the State of Missouri, party of the first part, and the St. Louis and O'Fallon Coal Company, an incorporation under the laws of the State of Illinois, Edward L. Thomas and John T. Taylor of the city of

East St. Louis and State of Illinois, parties of the second part, witnesseth : That the said party of the first part has leased and does by these presents lease unto the said parties of the second part for the term of five (5) years from October 1st, 1896, the coal mine or pit known as the Johnson mine, and one acre of ground lying around the shaft, together with the engine, boiler, track, cars, tools, machinery, fans and appurtenances of every kind now in the mine. The said parties of the second part have made an inspection of the mine, engine, boiler, tools and utensils, and in consideration of the sum of seven hundred ($700) dollars to be paid to them out of the rents, have assumed the obligation of making all necessary repairs and furnishing all tools, implements, cars and utensils required to prosecute the business. All of said property is hereby included in this lease and is to be given to said first party at the termination of this lease, in as good order and condition as when received, natural wear and tear excepted. Also the exclusive coal privileges underlying the following described parcel of land, to wit : all of that part of the southwest quarter of section No. 35, township No. 2 north, of range 9 west, in St. Clair county, Illinois, lying north of the Air Line Railroad, and the west half of the southeast quarter of section No. 35, township 2 north, of range 9 west.

Said parties of the second part promise and agree to pay as rent or royalty, five cents per ton for all lump coal which passes over a one-inch sieve, and mine run coal. The said payment of royalty shall be made on the 15th day of every month for the coal mined and shipped during the preceding month, and said second parties promise and agree to make monthly statements showing the amount of coal taken from the mine and agree to allow said first party free access to all books, papers, freight receipts and other papers which it may be deemed necessary to examine for the purpose of verifying and determining the accuracy of the monthly statements.

The said parties of the second part covenant and agree that the yearly rent or royalty from said property shall not be less than six hundred ($600) dollars. On the first day of October in each year, an annual statement will be made, and if the rent or royalty paid during the year shall be less than six hundred dollars, the difference shall be due and payable to said first party.

In case of the failure of the said second parties to make full and complete statements on the fifteenth day of every

month, of the coal mined the preceding month, or within thirty days thereafter, or to make a full and complete annual statement on the fifteenth day of October in each year, or within thirty days thereafter, or to pay the monthly rent or royalty on the fifteenth day of each month, when it is due and payable, or within thirty days thereafter, or to pay the yearly rent or royalty herein stipulated on the fifteenth day of October in each year, or within thirty days thereafter, then this lease may be forfeited by the said parties and the said second parties shall immediately surrender possession of the premises together with all the property and appurtenances appertaining thereto, unto the said party of the first part or his assigns. The said party of the second part shall retain from the royalty or rent herein reserved, one-half of the amount due each month, until the aggregate of the sums retained shall amount to seven hundred dollars, the sum hereinbefore mentioned.

In witness whereof, the said parties have hereunto set their hands and seals to this lease and a duplicate copy of the same, the day and year above written, and the said St. Louis & O'Fallon Coal Company has caused these presents to be signed by its president, attested by its secretary and its corporate seal hereto attached, the day and year above written:

<div style="margin-left:2em;">

JOSEPH T. DONOVAN.                        [SEAL.]
ST. LOUIS & O'FALLON COAL COMPANY:        [SEAL.]
  By Edward L. Thomas, President.
EDWARD L. THOMAS.                         [SEAL.]
JOHN T. TAYLOR.                           [SEAL.]

</div>

Attest:·
  W. A. REISS, Sec'y."

This contract includes appellee's coal under the hundred and thirty-five acres, the surface only of which was owned by appellant, and it includes it as a part of the coal privileges appertaining to the Johnson mine. Under this contract the St. Louis & O'Fallon Coal Company went into possession of the Johnson mine, and on the thirtieth day of November, 1896, sublet it to Thomas Davis and a number of others, evidenced by a writing as follows:

" This agreement, made and entered into this 30th day of November, A. D. 1896, by and between the St. Louis & O'Fallon Coal Company, party of the first part, and Thomas Davis, Enoch Travis, Joseph Guest, Steven Guest, Abraham

Ralph, William Ormson, James Ormson, Joseph and John L. Nevener, party of the second part, witnesseth:

The party of the first part hereby sublets to the party of the second part the coal mine known as the Johnson mine on the Air Line Railroad, as the same now is, under the terms of the lease acquired by party of the first part from Joseph T. Donovan, dated October 1, 1896, for a term of five years from said October 1, 1896.

The party of the first part is to sell the coal to be mined and put on cars by the said party of the second part, and hereby agrees to take from said party of the second part during the said lease an average of four cars per day for all working days in a year, or a minimum of twelve hundred cars per year during each year of said subletting as the state of the market will permit so as to give as near as may be continuous work, not less than eighteen cars in any one week. If a strike compels a stoppage the time is to be deducted.

Said party of the first part is to pay to said party of the second part for said coal, free on board cars at the pit, the following prices during the said term.

First.  For good, clean, screened lump coal, the sum of fifty-five cents per ton, during the months of October, November, December, January and February of each year.

Second.  For good, well screened nut coal, the sum of twenty-two and one-half cents per ton during the said months of October, November, December, January and February of each year.

Third.  For good, well cleaned mine run coal, forty-four cents per ton during October, November, December, January and February of each year.

Fourth.  For good, clean screened lump coal, the sum of fifty cents per ton during March, April, May, June, July, August and September of each year.

Fifth.  For good, well screened nut coal, the sum of twenty cents per ton during the months of March, April, May, June, July, August and September of each year.

Sixth.  For good, well cleaned mine run coal, the sum of forty cents per ton during the months of March, April, May, June, July, August and September in each year.

The prices of lump and mine run coal as herein fixed shall be increased in case the mining wages are increased during the said term, by the amount of such increased mining prices, which increase is to be fixed by the average of the increase that may take place in the Avery mine, the Harmony mine and the Gartside mine.

All the coal is to be well cleaned of dirt, slate and sulphur, according to the best methods of good mining. All payments are to be governed by the railroad freight bills which shall be presented by the party of the first part to the party of the second part on each payment and which shall be subject to the examination of said party of the second part or any agent by them appointed.

All coal shipped shall be paid for at prices herein set forth on the tenth and twenty-fifth of each month for coal shipped up to the first and fifteenth of each month.

The said party of the first part shall upon each settlement on said tenth and twenty-fifth of each month, retain from the prices herein fixed the sum of five cents per ton for all lump and mine run coal shipped during said time aforesaid, for which settlement is made as the royalty reserved in said lease of said Joseph T. Donovan, and shall be alone responsible upon such retention for said royalty as fixed in said lease.

The said party of the first part shall upon each settlement on said tenth and twenty-fifth of each month, retain from all coal shipped and included in said settlement, the further sum of five cents per ton out of said fixed prices, as payment for the improvements and repairs put on said mine by the party of the first part, until the said sum so retained for that purpose shall amount in the aggregate to the sum of $2,000, when said party shall cease to retain any further sum for said purpose.

It is distinctly understood that, no freight nor liabilities for freights are to be paid or incurred by said party of the second part, the said party of the first part to take the coal at the mine free on board cars.

It is further agreed that no coal is to be shipped from said mine to any other person or persons except to the party of the first part or except by its consent or direction, and at the end of each year, in case amount is not taken as herein agreed, an arbitration is to be had as to the amount that party of the first part ought to pay on amount not taken.

It is further agreed that in case more coal is needed than the parties of the second part can furnish by themselves, they shall, on demand, put on more men and furnish coal on demand of party of the first part to full capacity of the mine.

Said party of the second part is to deliver possession of said mine to the party of the first part at the expiration of the said lease of said Donovan, leaving all property required to be left by said lease and under the terms thereof.

In testimony whereof, the parties have hereunto set their hands and seals the day and year aforesaid in duplicate.

THE ST. LOUIS & O'FALLON COAL COMPANY.    [SEAL.]
    By Edward L. Thomas, President.
THOMAS DAVIS.                                 [SEAL.]
ENOCH TRAVIS.                                 [SEAL.]
            his
JOSEPH X GUEST.                               [SEAL.]
          mark.
STEPHEN GUEST.                                [SEAL.]
ABRAHAM RALPH.                                [SEAL.]
WM. ORMSON.                                   [SEAL.]
JAMES ORMSON.                                 [SEAL.]
JOSEPH LAWTON.                                [SEAL.]
JOHN L. NEVENER."

In pursuance of these agreements and prior to the commencement of this suit, large quantities of coal were taken out of the mine, some of it from the 24½ acre tract, and over 5,000 tons from appellee's coal under the 135 acres. Coal was taken out of both these tracts of land at the same time, but it was all brought up out of the mine together, and nothing to indicate what part of the mine it came from.

It was all reported to appellant and he was paid the royalty or interest specified in the contracts, upon the whole of it. This coal was worth on the cars at the mine sixty-five cents per ton, and the cost of raising it from the places where dug in the mine and placing it upon the cars was thirteen cents per ton. Appellant testified on the trial, that he never did own nor claim to own the coal under the 135 acres; that he knew it had been sold to appellee before he bought the land; that he wrote or dictated the contract between him and the St. Louis and O'Fallon Coal Company; that he did not intend to include appellee's coal in that contract and did not know how he came to do so, except that he had a general plat of this land in his office and in making the contract he failed to remember that the coal had been sold to appellee before he owned the land, and that he never knew that appellee's coal was being mined and taken out through the Johnson mine, until about the time this suit was commenced. This testimony is not contradicted.

Upon this state of facts two questions arise. First, as to the liability of appellant, and, if liable, then, as to the proper measure of damages. These questions are fairly raised by exceptions on behalf of appellant, to the action of the trial court in its holdings upon certain propositions of law submitted by the respective parties during the trial.

Appellant's counsel contend that appellant is not to any extent liable for the trespass committed in mining and taking away appellee's coal. They concede the law to be "that every one who participates in a trespass is liable therefor, and that every one who directs, requests, advises, aids or abets a trespass, is a joint trespasser with him who actually does the act constituting the trespass," but they deny that the facts of this case show that appellant did in any manner or to any degree, within the proper meaning of the law, direct, request, advise, aid or abet the commission of the trespass complained of. They insist that the relation subsisting between appellant and those who operated the mine under the contracts above set out, was that of landlord and tenant; that "the relation of principal and agent is not created by a lease, neither is the relation of master and servant; and that the maxim *respondeat superior* has no application to cases where the relation of landlord and tenant subsists." And further, that if it be held that the relation of landlord and tenant did not exist as to the coal under the 135 acres, then it could be at most only a license, and the maxim *respondeat superior* is inapplicable to the owner of land for acts of negligence of a licensee in a business not conducted by the owner or for his account. Many texts and cases are cited in support of these positions but to our minds they throw little light upon the situation, for appellee's case, we think, does not depend upon the application of the doctrine *respondeat superior*, neither is the wrong complained of an act of negligence of a tenant or a licensee of an owner. The wrong complained of is a trespass; and the question is, did appellant in any manner and to any extent, direct, request, advise, aid or abet its commission.

We have been unable to find, in the text books, any discussion upon the exact state of case before us, nor have we found any exactly parallel case reported. One who in any manner indicates his desire that an act be done, may be said to request it, and one who does anything in furtherance of an act may be said to aid or abet it. Appellant owned and was in possession of the Johnson mine and its equipment. He owned and was in possession of the surface of the whole tract of 159½ acres of land. He put the parties named in the contract into possession of the entire mine and equipment for the sole purpose of having them mine and remove coal for his own benefit as well as theirs, and he granted and undertook to give to them the right to mine and take all the coal from the whole 159½ acres, and in pursuance of such grant, appellee's coal was actually mined and taken away. We think it clear that appellant did request, or aid and abet the trespass.

While the contracts in evidence are in the nature of leases, and between all the parties thereto, and as to all persons claiming by or through any of them the contracts may properly be held to be leases, yet, as between appellant, who granted and undertook to give the right to mine and take this coal which he did not own nor claim to own, and appellee, an entire stranger to those contracts, we can see no reason why the well established rule does not apply, that one who assumes control over the property of another, without right or authority to do so, is responsible for all the consequences. In Gibbs v. Chase, 10 Mass. 128, the court, by Sewell, J., says:

"No actual force is necessary to be proved. * * * He who interferes with my goods, and without any delivery by me, and without my consent, undertakes to dispose of them, as having the property, general or special, does it at his peril to answer me the value in trespass or in trover."

In arriving at the amount of damages, the trial court adopted as the rule for admeasurement of damages in such cases, that the trespasser is liable for "the value of the coal at the mouth of the pit, less the cost of carrying it there

from the place where it was dug, allowing the trespasser nothing for digging." This is the rule adopted by our own Supreme Court and laid down in Robertson v. Jones et al., 71 Ill. 405; I. & St. L. R. R. & Coal Co. v. Ogle, 82 Ill. 627, and in I. & St. L. R. R. & Coal Co. v. Ogle, 92 Ill. 353. So far as we are advised, no other rule as applicable to this particular class of cases has ever been held in this State. · If this is the true rule to apply to the facts in this case, then it is not contended that the amount found is excessive, but appellant's counsel contend that if appellant is guilty of any wrong, it was unintentional, was a mere mistake, and they insist that the rule adopted gives punitive damages and applies only in cases of intentional, willful, malicious, fraudulent, oppressive, wanton or reckless torts, and many authorities discussing punitive damages are cited.

Punitive or exemplary damages are such as may be imposed by way of punishment of the wrongdoer and do not to any extent depend upon the value of the property wrongfully taken nor the amount of actual pecuniary damage sustained, but depend wholly upon the motive, purpose and condition of mind and heart of the wrongdoer and the circumstances and manner of his doing the wrong. Punitive damages are in no way limited by the amount of actual damage. · The smallest actual damage will, in a proper case, be sufficient to support a verdict and judgment including thousands of dollars punitive damages. Punitive damage is not, as we understand it, a factor in the rule adopted by our Supreme Court for the admeasurement of damages in this class of cases. The purpose of the rule is to provide for compensation only to the wronged one, but it is intended to be sufficiently liberal to produce in all cases, full compensation. It is, however, always limited, and can never exceed the actual cash value of the coal taken.

Appellant's counsel further contend that the facts of this case bring it under the rule that " where the appropriation of the property of another was accidental or through mistake of fact, and labor has in good faith been expended upon

it, which destroys its identity or converts it into something substantially different, and the value of the original article is insignificant as compared to the value of the new product, the title to the property in its converted form must be held to pass to the person by whose labor in good faith the change has been wrought, the original owner being permitted, as his remedy, to recover the value of the article as it was before the conversion." They cite in support of this contention, Wetherbee v. Green et al., 22 Mich. 311, and claim that appellant is liable only for what the coal was worth as it was in the bank before it was undercut and shot down.

The opinion in the case relied on was written by Judge Cooley, and in his work on torts he refers to it as an extreme case and says, " perhaps no case has gone further." In that case Green, one of the plaintiffs, and one Sumner, owned a tract of land as tenants in common. While they so owned it Green orally authorized Sumner to sell the growing timber. Sumner conveyed, by warranty deed, his interest in the land to secure a debt, his grantee orally agreeing to reconvey upon payment of the debt. After this, Sumner sold a small quantity of the timber to Wetherbee. Wetherbee, acting in perfect good faith, believing Sumner had right to sell the timber, cut it and made it into 48,000 barrel hoops. The timber as it stood was worth only $25, but the barrel hoops were worth $800. Green and Sumner's grantee replevied the barrel hoops. The court held that the case fell under the rule above quoted on the grounds of the perfect good faith of Wetherbee, the changed condition of this timber wrought by his labor, and the very great difference between the value of the timber as it stood on the land, and that of the manufactured product. In the case at bar appellant did not in good faith believe he owned appellee's coal nor that he had authority to grant the right to mine and take it away. If he made a mistake, his mistake was the result of his own negligence and very great negligence. Then the change wrought by shooting the coal down was inconsiderable, and the difference in value of it in the bank

and as shot down is not at all comparable with that in the case relied on.

Some years later, in Isle Royal Mining Company v. Hertin et al., 37 Mich. 332, Judge Cooley again wrote the opinion of the court on this subject. That case is much more analogous to the one at bar than is Wetherbee's case, and the court there holds against the position here contended for by appellant's counsel.

We find no error in this record calling for a reversal of the case. The judgment of the Circuit Court is affirmed.