## NEW JERSEY ZINC CO. v. AMERICAN ZINC, LEAD & SMELTING CO. et al.

(Circuit Court of Appeals, First Circuit. October 28, 1922.)

No. 1580.

1. Patents ⊙==328—931,815, for furnace for roasting zinc ore, void for lack of invention.

The Tucker patent, No. 931,815, for a furnace for roasting zinc ore, *held* void for lack of invention, in view of the prior art.

2. Trial ⊙==63(3)—Admission of cumulative evidence discretionary.

Admission of evidence on rebuttal which is merely cumulative is discretionary with the court.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in equity by the New Jersey Zinc Company against the American Zinc, Lead & Smelting Company and others. Decree for defendants (276 Fed. 733), and complainant appeals. Affirmed.

William H. Davis, of New York City (Merton W. Sage and Pennie, Davis, Marvin & Edmonds, all of New York City, and Woodman, Whitehouse & Littlefield, of Portland, Me., on the brief), for appellant.

Frederick L. Emery and Preston Upham, both of Boston, Mass. (Clarence A. Hight and Emery, Booth, Janney & Varney, all of Boston, Mass., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a suit in equity brought by the New Jersey Zinc Company, a New Jersey corporation, against the American Zinc, Lead & Smelting Company and the American Zinc Company of Illinois, Maine corporations, charging infringement of letters patent No. 931,815, issued August 24, 1909, to the plaintiff on the application of Allen Tucker, assignor. The defenses are invalidity and noninfringement. In the District Court the bill was dismissed on the ground that the alleged improvement did not involve invention. In its assignment of errors the plaintiff, appellant, contends that the court erred (1) in finding and ruling that the patent was invalid; and (2) in refusing to receive certain testimony offered in rebuttal.

[1] In his specification the patentee states that his "invention relates to furnaces in which a rake is reciprocated for the purpose of stirring the contents of the furnace, and is particularly applicable to that class of furnaces in which ore is roasted, such as zinc and other ores," and that "the invention resides in mechanism for operating the rakes of such furnaces so that the movement of the same will always be under easy and immediate control, and whereby the number of men necessary to operate such furnaces is reduced."

The record shows that furnaces for roasting zinc sulphide ores were old, that Edward C. Hegler invented such a furnace and that a patent issued to him therefor as early as August 12, 1884. These furnaces consist of a brick structure containing 14 ovens arranged in two tiers, each oven being 80 feet long, 6 feet wide and a foot and a half high. At

each end of the brick furnace, but slightly removed therefrom, is a structural framework called the "rod alley," upon which is mounted machinery for mechanically drawing the rakes through the ore, while it is roasting, for the purpose of stirring it and progressively moving it along each oven.

This machinery consists of a pair of sprocket wheels mounted at opposite ends of the rod alley and carrying an endless chain to which is attached an iron rod about 100 feet long and about an inch and a half in diameter, supported by guide pulleys. By means of sliding gears or clutches one sprocket wheel of each endless chain may be connected to the main shaft driven by a reversible electric motor provided with a controller by which its direction of rotation can be determined and its speed regulated.

These sliding gears or clutches and the controller, with the necessary cables and extension arms usually required to effect manipulation at a distance of such instrumentalities, constitute the control mechanism for the rake-moving machinery. A turntable is provided at each end of the brick furnace and between it and the respective rod alleys. Each turntable has seven superimposed shelves corresponding in height with the seven ovens in each section of the furnace. The turntable is used to support the rakes during their idle periods and to transfer them, when withdrawn from one tier of ovens, into position for entering the other tier.

It takes 2 hours to complete the roasting of a single charge of ore, and of this time 15 minutes is consumed to rake each tier of ovens. The ore to be roasted is periodically charged into one end of the top oven of a tier, where it is stirred and worked toward the opposite end of the oven by means of a mechanically drawn rake, where it drops through a slot to the oven below. It is then raked towards the other end of that oven and drops through a slot to the oven next below, and so on until the roasted ore is finally discharged from the bottom oven. These rakes are large iron structures weighing from 1,200 to 1,500 pounds each. Prior to Tucker's alleged invention two men were required at each end of the furnace for the raking operation.

One man, called the machine or floor man, operated the controller arm, which started, stopped, and gave direction to the mechanism that moved the rake rods in the alley at his end of the furnace. He also had charge of the extension cords or chains, which threw in and released the clutches or sliding gears that operated the rake rod for any given rake. The place from which he operated these instrumentalities was on the ground at the end of the rod alley next to the furnace.

Another man, called the hooker, and whom we will designate as hooker man No. 1, attended the guiding of the respective rods from the rod alley at his end of the furnace into the ovens. When one of such rods reached the other end of the furnace, the hooker man at that end, whom we will call hooker man No. 2, hooked the rod to the corresponding rake on the shelf of his turntable. This being done, the rake was drawn through the oven to the shelf on the turntable of hooker man No. 1, who unhooked the rod. It was also a part of the work of hooker man No. 1 to hook a rod coming through an oven

from the rod alley at the opposite end of the furnace to the corresponding rake on the shelf of his turntable preparatory to a rake being drawn back through the oven to hooker man No. 2.

At each end of the furnace were four platforms, two at each side of and adjacent to the respective turntables. The hookers, in performing their work on the three upper ovens, stood on the upper platform; in performing their work on the next two ovens, on the platform next below; and for the lower two, upon the ground. This practically covers the state of the art at the time of the alleged invention of Tucker.

What Tucker did was to run the chains or ropes, that operated the clutches and threw a given rake rod into or out of operation, to the platforms and ground where the hooker man was required to be to operate a given oven, and to extend an arm of the controller to these places, so that the hooker man might be able to operate the controller and the clutches, as well as perform the work previously required of him at these places, and the question is whether what he did involved invention.

Claims 1 and 2 are in issue and read as follows:

"1. The combination with a furnace having a plurality of tiers of ovens, a pivoted transfer table located at each end of the furnace and adapted to move into position opposite the end of each tier, and having shelves located on a level with each oven, operators' platforms located adjacent said transfer tables at the end of each tier of ovens, a series of rakes adapted to pass through both tiers of ovens, mechanism for reciprocating said rakes, and controlling mechanism for said reciprocating mechanism having their ends located at said operators' platforms.

"2. The combination with a furnace having two tiers of ovens, a turntable located at each end of the furnace, and pivoted centrally between the tiers so as to move into position opposite the end of each tier, shelves carried by said turntable on a level with each oven, operators' platforms located at each side of said turntable adjacent the ends of each tier of ovens, a series of rakes adapted to pass through both tiers of ovens, mechanism for reciprocating said rakes, controlling means for starting and stopping said mechanism, means for controlling the direction of motion thereof, said controlling means having ends terminating at said operators' platforms."

As previously pointed out, the furnace with a plurality of tiers of ovens, the pivoted transfer table located at each end of the furnace and adapted to move into position opposite each tier of ovens, and having shelves on a level with each oven, the operators' platforms adjacent to the transfer tables, the series of rakes adapted to pass through both tiers of ovens, the mechanism for reciprocating the rakes, and the controlling mechanism for the reciprocating mechanism singly and in combination, were old. The only thing that was new was the place to which the mechanisms controlling the clutches and the motor were led. It eliminated the work of a man on the ground, so far as his time was occupied in operating the controls, which the evidence shows was about a half an hour in every two hours of the operation of the furnace. If the elimination of one man by the extension of the control mechanism to the platforms and the ground, where the hooker man from the necessities of the case was required to be to tend the ovens, was an obvious thing, the idea did not involve invention, and it is and must be conceded that the mechanism employed in carrying out the

idea of extending the controls did not involve invention, as it called for only mechanical skill of the imitative character.

The plaintiff strenuously contends that this change was not an obvious thing. But whether it was or was not obvious involves the determination of a question of fact, depending upon the state of the art, the nature of the thing done, the necessity or desire for overcoming any difficulties which may have existed, the endeavor by those skilled in the art to overcome those difficulties, and the benefits attained.

When the state of the art is understood, the nature of the thing done by Tucker was such that, instead of causing one to believe that it involved inventive thought, leads to the opposite conclusion. But this is not necessarily conclusive of the question, if the idea overcame difficulties with which those skilled in the art had been confronted, and had undertaken to solve, but had failed, and the benefits attained were of a substantial character. The evidence fails to convince us that there were any substantial difficulties in the operation of the furnace which Tucker's conception obviated through his extension of the control arms. It is true that no one had carried the controls to the platforms prior to him. It appears, however, that the idea had previously occurred to others, but that they had not considered it of sufficient consequence to put it into practice, and chiefly because they regarded the labor of the machine or floor man as essentially necessary to the operation of the furnaces in ways other than operating the controls, which took only about a half an hour out of every two hours of his work.

It is also claimed on the part of the plaintiff that, by locating the controls at the platforms to be operated by the hooker man, the work was rendered more safe and expeditious; that it obviated the necessity of signaling from the hooker man to the floor man to stop the movement of the rake rod, when hooking or unhooking it from a rake, or when occasion required in its passage through an oven, in case it happened to be obstructed in its movement. But signaling was obviated only in a minor respect. The change in the location of the controls did away with signaling by hooker man No. 1 to the machine man, who was near by, and could see and be seen by the hooker man, but did not do away with signaling by hooker man No. 2, who is and was stationed at a much greater distance from the control operator, and in a position where he could not see or be seen by the operator.

The record shows that rake rods, in passing into and out of the rod alley, are supported and guided by grooved pulleys, and at the transfer table are supported by guides to a point within 2 feet of where they enter the oven, and that they carry a white mark, within view of the floor operator, indicating the point beyond which they cannot safely be carried outside the alley. After they enter the oven, they may at times become obstructed if the operator has failed to bend the rod slightly, so as to cause it to run towards the center partition, as there are breaks in the outside walls of the ovens, caused by the chisel holes. But this difficulty is obviated by slight care on the part of the hooker man in the manner suggested.

It is also claimed that the rake rods are at times obstructed in their movement through an oven by the metal becoming gummed and adhering in spots to the bottom of the oven. This difficulty, however, does not arise if the adhering spots are removed by the chiselers through the chisel holes, which are provided for this purpose at the outer side of the ovens.

Furthermore, it is far from clear that these alleged difficulties are materially obviated by the control mechanism being extended to the hooker man on the platforms. The ovens are 80 feet long, 6 feet wide, and a foot and a half high; the air and gases in the ovens, when the rake rods are being put through, are at an intense heat; the ovens are filled with smoke; and the holes in the oven doors through which the rods are inserted are only about 6 or 8 inches square. Under these circumstances it is difficult to believe that the hooker man, standing on a side platform, could see sufficiently into an oven to perceive an obstruction and prevent the occurrence of difficulties such as are here suggested, or that the placing of the controls in his hands was any marked improvement in dealing with these troubles. We are therefore unable to find that the benefits claimed by Tucker's changed position of the controls were of such a character as to afford any satisfactory aid upon the question of invention.

Neither do we think that any particular weight is to be ascribed to the fact of the issuing of the patent to Tucker by the Patent Office. The proceedings in the Patent Office disclose that the Examiner was wholly uninformed of the state of the prior unpatented art at the time he allowed the claims; that he did not know the pivoted transfer table was old, or that the reciprocating rake mechanism and controlling mechanisms were old; and it is quite probable, if he had known the true state of the art, that he would not have allowed the claims here in issue, which embody all these old elements, for he refused to grant a claim like claim 1, except that it did not contain the pivoted transfer table.

[2] The evidence offered in rebuttal was cumulative to that offered by the plaintiff in presenting its affirmative case, and, such being the situation, it was discretionary with the trial judge whether he would receive or reject it. But, if any of the evidence may have been in some particular strictly rebutting, the plaintiff takes nothing by its exception, for the evidence is before us, and after giving it due consideration we do not think it warrants a conclusion different from that which we have reached.

The decree of the District Court is affirmed, with costs to the appellees.