**UNITED STATES v. HIRSCH et al.**
No. 112.

Circuit Court of Appeals, Second Circuit.
Dec. 3, 1934.

David P. Siegel, of New York City (Charles H. Tuttle and Milton B. Seasonwein, both of New York City, of counsel), for appellants Gorlitz and Hirsch.

Solomon Charles Sugarman, in pro. per.

Martin Conboy, U. S. Atty., of New York City (Joseph E. Brill and Francis A. Mahony, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

216

MANTON, Circuit Judge.

The appellants were indicted in twenty counts charging them, and others, with using the mails in furtherance of a scheme to defraud (U. S. C. title 18, § 338 [18 USCA § 338]), and in one count of conspiracy to violate the mail fraud statute (U. S. C. title 18, § 88 [18 USCA § 88]). The proof established the scheme or artifice by which they defrauded the various victims to be the incorporation and use of the Sheldon Hosiery Company, Inc., and the Mills Research Corporation, through which they popularized and sold hosiery for women throughout the United States. It was represented by them that, if the victims would send appellants $1, they would receive in return therefor six pairs of full-fashioned pure silk hosiery, guaranteed not to run, valued retail at between 90 cents and $1 a pair in the best shops. The offer was said to expire in 30 days, and thereafter such hosiery could only be purchased through dealers and shops at increased prices. If the purchasers were dissatisfied for any reason, upon request, their money would be "cheerfully refunded." But, upon receipt of remittances of $1 from the purchasers, the appellants would not send six pairs of silk hosiery to their purchasers as promised, but in lieu thereof would merely acknowledge receipt of the remittance in a letter inclosing three order cards, and advising them that, in order for them to obtain the hosiery, they would have to induce three other persons likewise to send to the appellants $1 with the order cards, and, upon receipt of the moneys and order cards, the appellants would immediately send the stockings to the purchasers. They did not send the stockings to these purchasers.

The twenty-first count charged a conspiracy, beginning July 1, 1932, and continuing to the date of the filing of the indictment, September 1, 1933, to use the mails in furtherance of the scheme referred to in the first twenty counts, and it set forth overt acts done in pursuance of the conspiracy.

The evidence clearly connects each appellant with the conspiracy and the substantive offenses charged. Sugarman and three other defendants formed the Sheldon Hosiery Company about December 19, 1932. Arrangements were made with Jules Gorlitz, Inc., and the Kramer Hosiery Company, prior to the filing of the certificate of incorporation in the county clerk's office December 19, 1932, for the purchase of hosiery on a cash basis. Some were used to start these endless "chains." About 496½ dozen pairs were purchased from December 21, 1932, to January 31, 1933. There was an exhaustion of supply and no cash on hand to buy additional supplies. However, thereafter hosiery was again supplied to the corporation and the business expanded through the intervention of Hirsch. Were it not for Hirsch joining and supplying funds and credit, the scheme would have ended at the time of his entry. The place of business was enlarged and more employees placed at work. The entire stock of the Sheldon Hosiery Company was transferred to Hirsch at his demand. He installed a representative to protect his interests and make daily reports to him. At Hirsch's suggestion the Mills Research Corporation was organized. It employed 70 workers in two places of business. Hirsch agreed to purchase 7,000 dozen pairs so that "they might be sent out to get things started." Five thousand dozen pairs of these were distributed in half dozen lots to the first 10,000 people making remittances of $1 each; 1,000 dozen in single pairs to the next 12,000 people remitting $1; 1,000 dozen pairs were used when necessary to satisfy "squawks" and "chains."

After study and approval by Sugarman, three circular form letters were sent through the mails to women. The first contained an alluring description of the quality and texture of the hose; an order blank was inclosed to be filled out and returned to the appellants with $1 in a self-addressed envelope. The second was used to acknowledge receipt of the order blank and remittance, and inclosed three additional blank order cards together with self-addressed envelopes. In this there was an exaggerated description of the hosiery, and it stated that the purchasers would obtain six pairs without further cost upon condition, however, that they induced each of three friends likewise to remit $1 for six pairs of Sheldon hosiery. The third informed the victims that six pairs of hosiery were being shipped in accordance with the order, and it also inclosed three blank order cards and contained an offer of six pairs of stockings absolutely free to the victim upon condition that each of the three friends to whom the cards would be distributed would purchase six pairs of hosiery for $1. Such letters started the endless "chains" of dollars to appellants. By this scheme it was pretended that the victim would get "six pairs of these marvelous full-fashioned, rich silk hosiery for One Dollar"; that the stockings were of a quality for which the purchaser "would have to pay normally at least 95¢ a pair in the best shops"; that

the hosiery could be obtained "in any assortment of sizes, styles and colors for less than 17¢ a pair"; that it was an advertising offer; that the only condition attached was that the victim would "recommend our hosiery to your friends and help us to tell every woman about Sheldon hose"; that the company would cheerfully make refunds in the event of dissatisfaction; and that not more than six pairs of $1 hose would be sold to any one customer and the offer would expire in 30 days.

The evidence showed these representations to be false. The use of the mails was established as to each of the substantive counts of the indictment upon which conviction has been had.

Sugarman actively participated in incorporating the company, passing upon the literature, and partook of the profits of the enterprise. He represented that he had a "connection," through an assistant in the Department of Justice in Washington, which would protect the enterprise. An assistant of the Attorney General's office (not now in the service) met defendants Rosen and Penn with Sugarman in a hotel in New York City, whereupon Sugarman and Rosen explained the details of their scheme to this assistant who said he had known of similar schemes, and that a "fraud order" by the Post Office Department would not issue, and that no criminal prosecution of persons engaged in this scheme would follow. The assistant said he would arrange to have it assigned to a friendly post office inspector in the event of an investigation of the subject, and, in return for procuring this, Sugarman promised to give him "G strings for his violin" (a bribe). Sugarman made ten or twelve trips to Washington for the purpose of delivering moneys to this government employee. At this time Hirsch had become a partner in the scheme. There were visits from a post office inspector who investigated the affairs of both corporations. The appellants all knew of this investigation and continued in the enterprise, and, in the presence of Hirsch and Gorlitz, Sugarman telephoned to the assistant in Washington promising to come down bringing a bribe.

When the appellant Hirsch entered the scheme, he knew of these activities of Sugarman and the other defendants. He instructed his representatives to give large sums of money to Sugarman for use in the bribing of this official and for Sugarman's expense money in traveling to Washington.

In February, 1933, an interview was obtained with a special assistant to the Attorney General in charge of postal fraud cases, at which time Sugarman outlined his scheme, and he was then advised that undoubtedly a fraud order would issue if they continued, and that those engaged would be subject to criminal prosecution. Nevertheless, the appellants continued sending out the literature through the corporations, and thereafter, at a conference attended by the appellants and other defendants, it was agreed to send Sugarman to Washington to give more protection money. As complaints came in from the victims for nonreceipt of the hosiery and demands for refunds were made, trickery was resorted to and false statements made to them; various untruthful excuses were offered. These letters were shown to each of the appellants and approved by them. It is unnecessary to enumerate the excuses mentioned in the letters.

The president of the Mills Research Corporation, when it was organized at Hirsch's proposal, used a fictitious name to avert suspicion because of the similarity of the literature distributed by both companies. When the government and postal inspector came, a person who masqueraded under a fictitious name as president of the company submitted to questioning by the post office inspector, for which he was paid a considerable sum of money. The efforts of the postal authorities to conduct an investigation of the enterprise were hindered and obstructed by the appellants. Misinformation was given. The government inspector made known to them that a fraud order would issue and that those engaged would be subject to prosecution. A contract was produced between the Sheldon Company and Jules Gorlitz Company under date of February 23, 1933, written by Gorlitz after the visit of the government inspector, with the approval of the appellants. This contract contained false statements; it was used to mislead and obstruct the investigation, and during the investigations the business continued. Both Gorlitz and Hirsch actively participated in the conduct of the business. In April, 1933, the corporation was cited to show cause why a fraud order should not be issued by the Post Office Department prohibiting the company from using the mails. Sugarman then communicated with the assistant to the Attorney General in Washington, arranging a meeting and promising to bring another "G-string for your violin." He received money from the corporation to do so with the purpose of in-

ducing the unfaithful government employee to prevent the issuance of the order, or to obtain the adjournment of the hearing on the citation.

On April 21, 1933, Sugarman wrote a letter to the Post Office Department consenting to the issuance of the fraud order and stated that they were "closing their advertising campaign" because they were having difficulty in obtaining deliveries of merchandise, and that they intended "to begin immediately to make refunds." Each of the appellants participated in the profits of the enterprise. The moneys received were very large sums as the "chain" grew to great proportions.

The evidence required the submission of the question of the guilt of each of the appellants to the jury, and warranted their conviction, for they, with guilty knowledge, formulated the conspiracy and participated in the enterprise. The defendants Rosen and Packard became government witnesses, and their testimony was fully corroborated, although corroboration was not necessary. Caminetti v. United States, 242 U. S. 471, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168; Allen v. United States, 4 F.(2d) 688, 690 (C. C. A. 8).

During the course of the trial, the newspapers of the city published accounts of the trial and in large headlines gave an account of the alleged bribing of an assistant to the Attorney General and Sugarman's part therein. They referred to Sugarman as a disbarred lawyer. Whereupon counsel for the defense called the court's attention to the alleged fact that some of the jurors had copies of the newspapers with them and were reading this news item, and that one was showing a newspaper to another when the court was not in session. A mistrial was asked. The government counsel suggested that, if the application were entertained, the jurors should be questioned as to the statement of counsel for the defense. The court denied the motion for a mistrial as well as the application for interrogation of the jurors. Error is alleged for the refusal of a mistrial. At the trial there was proof that Sugarman received moneys to use for bribes. Such evidence tends to establish the scheme and conspiracy charged to the appellants and was admissible. See Remus v. United States, 291 F. 501, 512 (C. C. A. 6). The cause became sensational with the newspapers because of this testimony, but none the less it was necessary to offer the proof. During the course of the trial Sugarman's disbarment was disclosed by his voluntary testimony. He ex-

plained also that he had been convicted of a crime; later the conviction was reversed in the highest court of the state, but he had not applied for reinstatement to the bar. When he became a witness, he asked permission to make explanation concerning the circumstances of his disbarment and did so. The court stated to the jury after the motion for a mistrial:

"Before you gentlemen leave, I would like to ask you if you will be very careful in connection with reading any newspaper articles about this case. Of course, you realize that you should keep your mind free in order to dispose of this case at the proper time, free from any prejudice and free from any bias, one way or the other. As I stated to you when you were sworn, the court is going to rely entirely on you and trust you to keep this jury and to keep yourselves clear so that when the proper time comes, you can do justice to the case. I think you owe that to yourselves as well as to the defendants and to the government."

Later a second motion was made for a mistrial based upon newspaper accounts in which it was said that counsel for the defense had assailed members of the jury. This motion was denied, the court saying:

"And after what the court stated to the jury last week on Friday, I cannot see myself, any reason to suppose that the jury as it is constituted at present, is not perfectly able to sift the evidence in this case and determine the merits of the controversy from that evidence unmixed with any of these extraneous circumstances such as have been suggested here * * * certainly from the showing that has been made here, I am not willing to assume that any member of the jury is going to, in any way, be prejudiced in this case any more than the court is."

And in the charge to the jury the court said:

"There has been a suggestion here with respect to headlines in the newspapers I am sure you men are in no way going to be prejudiced either for or against the government or the defendants in this case by reason of anything that you may have heard outside, whether it be in the newspapers or otherwise. I think this is important, not only from the standpoint of the jury, itself, but the administration of justice in the Federal Courts, and also from the standpoint of the defendants and of the Government, all of whom are vitally interested in the result of this case."

The court told the jury that there had been no criticism of it by any one and at de-

fendants' counsel's request charged that counsel did not at any time attack or make any charges whatsoever against any members of the jury, and that, if any juror or jurors read any such statement in any newspapers, such statements should be totally disregarded "because it is false."

A motion for withdrawal of a juror is addressed to the sound discretion of the court, and, unless there has been an abuse of that discretionary power, the appellate court will not reverse. Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Mattox v. United States, 146 U. S. 140, 147, 13 S. Ct. 50, 36 L. Ed. 917; Van Riper v. United States, 13 F.(2d) 961, 967 (C. C. A. 2). There was no error in refusing a mistrial.

■■ The secretary to the assistant to the Attorney General, who was charged with having received bribes, testified in rebuttal. She said she knew the appellant Sugarman and had seen him in the assistant's office on several occasions. She testified that in March, 1933, Sugarman telephoned in the absence of the assistant and left a message with her to "tell the boss I will be down tomorrow and bring a G-string." It is argued the appellee did not attempt to establish that she had given this message to the assistant who was to receive the bribe and that the evidence was prejudicial. It is said such testimony should have been admitted, if at all, as part of the government's direct case. The order of proof is a matter to be determined by the trial judge in the exercise of his judicial discretion. St. Paul Plow Works v. Starling, 140 U. S. 184, 197, 11 S. Ct. 803, 35 L. Ed. 404; New Jersey Zinc Co. v. Amer. Zinc, Lead & Smelting Co. (C. C. A.) 284 F. 305 (C. C. A. 1); Erie R. R. Co. v. Kennedy, 191 F. 332 (C. C. A. 6). We are referred to United States v. Sager, 49 F.(2d) 725, 730 (C. C. A. 2). There we held that the introduction in rebuttal of a matter purely collateral to the issues resulted in prejudice to the defendants. It was immaterial whether or not the message was ever delivered to the Assistant Attorney General, but the testimony was admissible to show that Sugarman had the conversation with his secretary as an element of proof supporting the charge of conspiracy. Nothing in the record suggests that the prosecutor withheld the evidence for rebuttal as a means of a "dramatic finish," as charged, or for any other effect. Other authorities referred to by the appellants are consistent with these views.

The appellants called the Assistant Attorney General, who testified that he never received any moneys from Sugarman. His testimony was offered to establish the good faith of Sugarman when conferring with the government concerning the corporations' business. There was no charge at this trial of bribery. On direct examination this witness made denial of the receipt of the so-called "G-strings." He disavowed any connection, active or otherwise, with the fraudulent scheme. On redirect examination it is claimed that counsel was erroneously restricted. We have examined the record and find no justification for this complaint. Ballew v. United States, 160 U. S. 187, 193. An effort was made to elicit much irrelevant matter.

■ The substance of the requests to charge made by the appellant Sugarman were fully covered in the court's main charge. By the requests, an attempt was made to have the court argue the appellants' cause, in counsel's language to the jury. This the court was not obliged to do, since it complied in substance with all the requests of the appellants. Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624; Goldberg v. United States (C. C. A.) 295 F. 447.

■ Appellant Sugarman argues that he was called as a witness before the grand jury and obliged to give self-incriminating testimony. He was subpoenaed as a witness, appeared, and voluntarily testified. He was warned that anything he might say would be used against him. We find no illegal self-incrimination. Powers v. United States, 223 U. S. 303, 32 S. Ct. 281, 56 L. Ed. 448; Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090; O'Connell v. United States (C. C. A.) 44 F.(2d) 201, 205 (C. C. A. 2); Perlman v. United States, 247 U. S. 7, 38 S. Ct. 417, 62 L. Ed. 950; Kaplan v. United States, 7 F.(2d) 594, 597 (C. C. A. 2).

■ On the hearing of this appeal, appellant Sugarman moved to remand the case to the court below where, as he contended, he wished to apply for a new trial upon the ground of newly discovered evidence. The petition shows that this application is based upon the fact that at a date subsequent to the trial of this indictment, Sugarman and the Assistant to the Attorney General were both acquitted of an indictment of conspiracy for giving and taking the bribes herein referred to. We denied a similar application made on behalf of all the appellants heretofore. We see no reason for changing the views we then entertained. The motion is therefore denied.

Judgments of conviction affirmed.