**UNITED STATES v. CARRUTHERS.**

**No. 8790.**

Circuit Court of Appeals, Seventh Circuit.

Dec. 27, 1945.

Writ of Certiorari Denied March 11, 1946.

See 66 S.Ct. 805.

Walter Bachrach and Edward J. Hess, both of Chicago, Ill. (Walter H. Moses, Morris Solomon, and H. G. Sheffner, all of Chicago, Ill., of counsel), for appellant.

J. Albert Woll, U. S. Atty., and William J. Connor, Asst. U. S. Atty., both of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

Appellant was convicted in the lower court on 34 counts of a 36 count indictment. Counts 1 to 9, both inclusive, charge a violation of Section 77 q(a) (1) of Title 15 U.S.C.A.[1] Counts 10 to 35, both inclusive, charge a violation of Section 338 of Title 18 U.S.C.A.[2] and Count 36 charges a conspiracy to commit the substantive offenses described in Counts 1 to 35 both inclusive in violation of Section 88, Title 18 U.S. C.A.[3] A nolle prosequi was entered as to Counts 5 and 9 at the close of the Government's case and the Court directed a verdict of acquittal of two co-defendants.

The indictment is so voluminous (143 pages of the printed record) that it is neither practical nor possible, within reasonable bounds, to state accurately and completely the charges there made. The first Count charges in minute detail a scheme and artifice to defraud on the part of the appellant and two co-defendants and this charge is carried forward into each succeeding count by reference. The scheme charged was that appellant organized the Neological Foundation ostensibly as a vehicle to disseminate the philosophy of self-betterment; that by radio programs, lectures and writings he solicited dues-paying members whom he called "students"; that by assuming scholarly degrees and by false representations as to his birth, education, wealth and studies in India and Tibet, he inspired his following with trust and confidence in himself and his teachings; that by talks and writings he solicited and induced his followers to invest their money in the Neological Foundation and several so-called business ventures he sponsored; that he represented that all money placed with him would be guaranteed against loss and that he would pay the lender 6% interest per annum and a 4% bonus; that the earnings from his organization and business ventures were insufficient to guarantee the principal or interest on the moneys placed with him; and as a result a great many of his investors were not repaid, their money having been appropriated by the appellant to his own use and benefit. The count charges that "from, on or about the first day of June, 1935, and continuously thereafter up to and including the date of the return of the indictment defendants unlawfully devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and by omissions to state material facts, from a certain class of persons * * * who were, would be induced to become, and who are members of the Neological Foundation, and who were desirous of making profitable and paying investments in the promissory notes, receipts and other evidences of indebtedness" of the defendant Carruthers or any of his various

1 "(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) To employ any device, scheme, or artifice to defraud, or"

2 "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement, * * * in any post office * * * of the United States * * * shall be fined not more than $1,000, or imprisoned not more than five years, or both."

3 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

activities such as "Nan-Gene" and "Happy Hearts." This is followed by twenty paragraphs alleging in detail the facts claimed by the Government to constitute the alleged scheme and artifice. Each of the mailing counts then sets out specifically the mailing of a letter or other document in furtherance, as the indictment charges, of said fraudulent scheme.

Appellant began his operations in Pittsburg, Pennsylvania, about June, 1935, but early in 1936 moved to Chicago where the balance of the activities charged in the indictment originated. He organized the so-called Neological Foundation and lectured to the general public by radio and otherwise on the philosophy of right living, as he conceived it. He claimed to be a doctor of medicine and a doctor of divinity; told some that he was born in England, had studied for the ministry and later was a monk at a lamasary in Tibet, that he had been an aviator in the first world war and was shot down resulting in his becoming blind. He said he regained his sight by following the principles and teachings that he was then advancing to his various audiences. To some he administered to their physical needs and to others he gave mental solace. He obtained a following of large proportions and his Neological foundation acquired a membership in excess of 4,000, each member paying dues of two dollars per month. His followers were bringing their money to him by way of loans or contributions far in excess of the dues required. He undertook at one time to market a product to be used as a shampoo which he called "Nan-Gene" and his public were invited to invest, the invitation being accepted in large numbers by the faithful. Later the shampoo formula proved unsatisfactory and he substituted a laxative product to be marketed under the name of "Happy Hearts." He gave those who had invested in "Nan-Gene" the opportunity of withdrawing their funds or leaving them with him for the advancement of "Happy Hearts." Few, if any, undertook to withdraw, but by reason of their abiding faith in the "doctor" continued their investment in the laxative product. The faithful may have reasoned that if the public were not interested in cleaning their hair with "Nan-Gene" that they might in any event cleanse their intestinal tract with "Happy Hearts."

It would unduly lengthen this opinion to further recite the activities of appellant, but it is sufficient to say that at least some of his representations were completely without foundation in truth. He stipulated during the trial that prior to 1934 he had been known under the name of Henry J. Boerum, and that except for a period in the latter part of 1919 and 1920 he had never been out of the territorial boundaries of the United States. Mary Wells testified that her father's name was Henry Boerum and that she had a brother by the name of Henry Boerum whom she had not seen for 19 years, but believed the defendant Carruthers to be her brother. John W. Gage testified that he was married to Ellen Boerum who had a brother Henry whom he had not seen since 1919 but believed defendant Carruthers to be that Henry Boerum.

The principal attacks upon the judgment of the lower court rest upon the assertion by appellant that:—

1. The scheme to defraud alleged in the indictment is not alleged to have been devised prior to the alleged mailings.

2. The undisputed evidence shows that the recipient of the count letters had in each instance parted with his or her money prior to the mailing of the letters.

3. The Court's charge to the jury violated defendant's constitutional freedom of religion.

4. Defendant was unalterably prejudiced by a juror's reading during the trial of a newspaper article critical of defendant.

These points were appropriately raised and preserved during the trial and, although only points 3 and 4 were argued orally in this Court none were waived.

1. In support of point 1, appellant urges that the indictment alleges a continuous devising of the fraudulent scheme from June 1, 1935, to October 25, 1944, the date of the returning of the indictment and that, therefore, the scheme was not completely devised until the returning of the indictment and consequently the letters alleged to have been mailed could not have been mailed in furtherance of the fraudulent scheme. Counsel for appellant reasons that the pleader found it necessary to aver a continuing scheming and devising in order to avoid charging more than one separate and unrelated scheme. McLendon v. United States, 6 Cir., 2 F.2d 660. A consideration of the indictment as a whole leads us to the conclusion that the argument is somewhat specious but not to be accepted. While the scheme al-

leged has many variations and many ramifications and the activities resulting therefrom extended into numerous fields, there was, in fact, but one fraudulent scheme charged. The conclusion is inescapable that the many variations were but parts of a general fraudulent purpose to get something for nothing. See Worthington v. United States, 7 Cir., 64 F.2d 936, United States v. McAlpine, 7 Cir., 129 F.2d 737. We think the fair construction to be put upon the language used in the indictment is that the scheme was entered into on or about June 1, 1935, and remained thereafter until the returning of the indictment a complete, active and virulent plan and purpose of defendants. The pleader used the word "devised" which connoted the formation of a complete scheme prior to the mailing of the letters. Other language in the indictment bears out this construction and in no event could defendant have been misled. The Congress has said (18 U.S.C.A. § 556): "No indictment found and presented by a grand jury in any district or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant." While we are not unmindful that the appellant asserts a total failure to charge an offense, yet we think the criticism directed at the indictment can be said to be one of form not resulting in any prejudice to defendants. We hold, therefore, that the indictment charged an offense and was not vulnerable to the motion in arrest.

2. Appellant also challenges his conviction for the reason, as he asserts, that each of the letters constituting the basis of each of the mailing counts, was mailed after the alleged fraud was committed and after the addressee had parted with all of the money paid by him or her to appellant. He reasons that the only justifiable conclusion to be drawn from the evidence is that any alleged fraudulent scheme had at the time of the mailing been abandoned and that further attempts to obtain money in connection therewith had been abandoned. He supports his position with the decision of the Supreme Court in Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. —, 157 A.L.R. 406, wherein the Court held under the evidence in that case that the scheme was completed when the money was received by defendants and that the subsequent banking transactions and the use of the mails in connection therewith were merely incidental to the scheme and not a part of it. Holding in that case that the mailing must be for the purpose of executing the fraud, the Court set aside the conviction. The many letters involved in our case prevent treatment of each, but we shall refer to the letter mailed to Helen T. Cunningham on November 25, 1941. Miss Cunningham had contributed to defendant some $400.00 prior to the date of this letter and we accept the assertion that she contributed nothing thereafter. The letter in question is a long one and we quote fragmentary parts in a footnote.[4] Obviously the letter is an urgent appeal for funds to be advanced, as the writer says, to further the interest of the Neological

---

[4] November 25, 1941

Dear Friend and Fellow:

This letter is intended to serve a double purpose. I hope you will read it carefully and that you will give it your sincere consideration. * * *

Look back on last year and you will see that within the short space of two years and two months our student membership grew from the original fifty-eight to four thousand, seven hundred and twenty-two persons; and that is a record, you will allow. A number of those students failed to continue to pay tuition when I was accused and arrested. The larger number continued in good faith, because knowing me well they knew I could never be guilty of such a crime. * * *

For several good reasons I am bringing to your attention once more the simple facts which I believe warrant this letter. First: I (and The Neological Foundation) am in need of money. I can secure more than I need by selling a part interest in this activity and organization. Two offers have been made. * * * Personally, I should rather hold The Neological Foundation in our own control and develop our activities into a nation-wide campaign myself, with eventual large membership and business income. This I can do easily as soon as I have the decision and may go ahead.

Second: With a rather reasonable amount behind me I can build this organization into tremendous proportions, and in doing so I should much rather work and build with you behind me than to include others outside of the organization. A new fund will enable me to go ahead now, put the campaign into effect,

foundation upon the promise of defendant of extravagant returns. It also contains representations which the jury were justified in finding false. The important point, however, is that the purpose of the letter and the effect upon the recipient are to be judged by the overall picture. It will be borne in mind that defendant had given numerous lectures over the radio and spoken at many meetings of his followers on the subject matter referred to in the letter as well as upon many other subjects. The reaction of the recipients of this and other letters can only be judged by all the facts and circumstances in the case. Whether this or other letters actually brought further contributions or "investments" cannot be the sole test of whether it was in furtherance of the continuing scheme to defraud pleaded in the indictment. If defendant was engaged in a fraudulent scheme of obtaining funds from a gullible group of individuals in the beginning, certainly the Cunningham letter evidences no abandonment of the purpose. We think the record justifies the conclusion that there was one scheme, continuously in operation during the time charged and that the count letters

---

and at the same time offer you, who help me, something exceptional in the future.

If, as seems to be inevitable, inflation comes upon this country; if money becomes practically useless, and taxation so high that buying power is drastically curtailed if war brings chaos to us and our government and bombings and destruction to our country; if the population is regimented into a defense unit, and some of the prophesies for the next three to four years are realized, you not only will not have any money, but you will not have any way of earning or getting any money. Then the fact that you have something behind you, as a loan with me and The Neological Foundation, will be a security. No matter what happens, your loan will be at the basic value of the amount you loan me now. No matter what kind of money may be in use, the amount with me will be on the basis of its value at the time the loan is given.

I shall until December 15th, 1941, offer six per cent interest per annum, plus a bonus of four per cent per annum (based on future earnings), to be repaid during July, 1945. Or if, at that time, you wish to allow your loan to remain with us, interest and bonus shall continue in force. After the 15th day of December, I cannot make this offer. I am, therefore, making the offer now.

If you want to lend me/us five dollars, ten dollars, fifteen dollars, twenty dollars, twenty-five or fifty dollars, or more, on the above basis, I shall appreciate it and I am sure you will be glad that you did so when July, 1945 comes around. Of course, Christmas is with us. Doubtless you are going to need money for buying. Why not save, at least five dollars (or more if you see the wisdom of doing so) that will return to you later with good interest and bonus. You will certainly be helping me, helping your organization, helping advance this gospel of Right Living through Right Thinking, helping thousands of persons to learn to live healthier, happier and more successful lives, and setting aside something you will need desperately in a few years.

A five dollar bill, or a ten dollar bill (or any amount you decide) saved now, loaned to me/us, will be wonders for me/us and for you.

If I were pastor of your church, you'd be asked to contribute without expectation of any return. A pastor or a church could not need money more right now than we need it. However, I prefer to ask you for a contribution-loan, which I can repay with good interest, rather than to beg for a donation.

Will you help me at this time?

A peculiar truth has proved itself times without number, during the past year; it is this: those who have loaned me any money have been blessed, have increased their incomes, have improved in many ways. Why? Because "inasmuch as you do it unto one of the least of these, you do it unto me," and great shall be your reward.

Ask yourself this question: "If I lost, or gave away, five or ten dollars now, would it break me?" Five or ten dollars, or even more if you want to set aside something for future income, loaned to Hugh Greer Carruthers and The Neological Foundation now will return to you, with good interest in 1945.

Will you help me and help yourself?

Thanks for your faith, kindness and help heretofore; thanks, too, for your help now, and going to you are the love and good wishes of—

Yours servant in Him,

Hugh G. Carruthers.

Please send, or bring, your loan amounts to Miss Evelyn Kroell, Secretary, Civic Opera Building, % the Neological Foundation, and make cheques or money orders payable to Hugh G. Carruthers. A receipt will be mailed to you upon receipt of your loan.

referred to were sent in furtherance of such scheme. That the letters may not have been successful on each occasion may be considered, but is not conclusively determinative of their character. The facts clearly distinguish our case from the Kann case, supra. See Brady v. United States, 9 Cir., 26 F.2d 400; United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836. While some of the letters in question may reasonably be said to fall within the scope of those cases giving recognition to the "lulling" character of letters sent after the alleged victim had parted with his money, we do not rest our conclusion upon this basis.

3. Under this point appellant urges that the Court's charge to the jury violated his constitutional guaranty of freedom of religion. The instruction on this subject is set forth in a footnote [5] the italicised portion being the subject of the attack. It is said that the phraseology of this instruction left a fact question to the jury as to appellant's religious belief on the subject of "Breathing, silence and position of persons during sleep" contrary to the holding of the Supreme Court in United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 and contrary to the first amendment to the Constitution of the United States. We do not think so. The instruction in no way violates appellant's constitutional rights as announced in the Ballard case. It is true that the subjects of "breathing" and "silence" find expression as religious practices in the ancient Yoga creed, 29 Encyclopedia Americana 638, and if Carruthers in his various activities believed in and was teaching this religious doctrine, the truth or falsity thereof was not to be questioned. This was precisely what the District Judge told the jury. He said, "If you believe that they are matters within the field of religion as taught by the defendant Carruthers" the truth or falsity of such representations was not to be questioned by the jury. It will be remembered that the activities of appellant were so broad and so diversified at times as to reasonably raise the question whether his activities were in fact of a religious nature. He himself wrote on November 25, 1941, as follows:—"I am outlining all this because I feel that you are still deeply interested in your organization, in me, and in your own future business, social and *academic* relations with me." Again on December 1, 1942, he wrote a follower: "We (Neological Foundation Associates) are a remarkable body of people, interested in our own Personal Development, or Self-Betterment through Self Knowledge, without political or *religious* or social preferments; a nation-wide non-sectarian, non-political group anxious only to impart the Truth of the Law of Cause and Effect, and the control of conscious thinking to all others who may desire this Plan for Better Living by and through which so many of us have learned to enjoy life so much more." On other occasions in 1942 he expressed himself as follows: "* * * it is necessary to function as a Fraternity as well as an educational activity. * * *. "* * * The Course of Training and Service of The Neological Foundation is written in such simple phraseology, explaining in minute detail the simple application of principles for the sake of ***material results*** that may be measured in health, happiness, prosperity and varying degrees of success." * * * "Neolia is not to be a cult center; we are non-sectarian. We shall be close to

5 "The first amendment of the constitution of the United States provides, as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

"This provision of the constitution as a matter of law protects the defendants, and each of them, from any inquiry by you into the truth or falsity of any of the religious beliefs, or doctrines, or representations made by the defendants, or any of them, which dealt with such beliefs or doctrines. In the consideration of the question of the guilt or innocence of the defendants in this case you must assume that any and all representations made by the defendants, or any of them, concerning matters pertaining to their religious beliefs or doctrines, were true at the time they were made, and this is so, irrespective as to whether such representations were written or oral, or partly written and partly oral, or merely based upon inferences which you may draw from printed or written documents in evidence.

*"You are further instructed that representations of the defendants, or any of them, concerning or relating to the subjects of breathing, silence, and position of persons during sleep, if you believe that they are matters within the field of religion, as taught by the defendant Carruthers, and the truth or falsity of such representations, if any, may not be questioned in any way by you in arriving at your verdict in this case."*

a small town which boasts churches, where you may attend for worship as you please." Under the facts of our case it became pertinent to know whether appellant was claiming to advance a religious doctrine. If the answer be "Yes" the jury were cautioned to keep hands off. We think under the circumstances the instruction in question eminently fair to appellant's cause. The instruction on the subject of freedom of religion must be read as a whole, and when so read leaves little doubt of the trial court's position on the subject, which we think entirely in harmony with the Ballard case.

4. Under this point appellant seriously urges that it was reversible error for the Court to refuse to declare a mistrial on account of an article appearing in the Chicago Daily News after the close of the evidence in the case which article concededly referred to appellant. The hearing of evidence was concluded on a Friday afternoon and the jury were permitted to separate and go to their homes. During that evening the article set forth in footnote [6] appeared in the News and was given wide circulation. When Court next convened on Monday morning counsel for Carruthers presented his motion to withdraw a juror and for a mistrial alleging that the article was probably read by the jurors and was highly prejudicial. The Court at the request of appellant thereupon asked the jurors collectively whether any had read the article. Juror Vincent answered: "I might have. I don't remember it unless I saw it again." The Court then said to the jury: "If you have, I told you when you were being selected that the only evidence that you would consider would take place in this court room and which was admissible and was ruled on by the Court. If any of you have read anything concerning this case, and if any of you have read anything, or of any of the defendants, that you did not hear in the court room by sworn testimony or documents you are to entirely disregard it, or anything that might have appeared before you get this case for your deliberation. Now I take it that you all understand it?" The jury at the request of appellant was then polled on the question of whether they had read the article, and when juror Vincent's name was reached on the roll call, the following colloquy occurred:

"Juror Vincent: I remember it. I would like to see it again, to be sure. I read the News. I probably read it.

"The Court: Do you recall now if there was anything in the article, if you did read it, that was not in evidence in this case, in this courtroom?

"Juror Vincent: I read in the paper something. The rest I didn't hear. It was discussed after the case was dismissed Friday afternoon.

"The Court: It was discussed by whom?

"Juror Vincent: A motion was made by the defendants.

"The Court: Yes.

"Juror Vincent: That is what I read.

"The Court: That is purely a legal question.

"Juror Vincent: That is what I figured.

"The Court: Anything else except the denial of that motion.

"Juror Vincent: That is what I recall.

---

6 "Lama Dodges Questioning on Robbery."

"The Kum Bum Lama dodged the witness stand in his Federal Court fraud trial this afternoon, and averted a showup of his career as highway robber before he grew a beard and named himself Dr. Hugh Greer Carruthers.

"The defense rested, and then Judge Philip L. Sullivan denied a defense motion for a directed verdict of not guilty offered for Carruthers. The Judge held in abeyance, until he receives the jury's verdict, motions for directed acquittal of the other defendants, Evelyn Kroell and Mary Morel.

"Prosecutor Francis J. McGreal had planned to put into the record, in cross-examination, the fact that Carruthers, under his real name of Henry Boerum, Jr., served a prison term in New York state for highway robbery.

"The failure of Carruthers to testify prevented this.

"The defense attorneys, Walter Bachrach and Edward Hess asked a directed acquittal on argument that Carruthers' Neological Foundation was a religion, like the 'I am' cult, whose sponsors won in the high courts.

"The Defense had conceded in court that the 'doctor' was really only Henry, a postal clerk from Brooklyn, and had not been educated as a lama in Tibet, but had merely learned the alphabet and some words as a fifth grade pupil in a Brooklyn public school.

"Closing arguments will begin Monday."

"The Court: For your information, that is done in every case.

"Juror Vincent: That is all I recall of the article.

"The Court: That means whether it is a question of law for the Court or jury to pass upon. That is what you have reference to?

"Juror Vincent: That is my understanding."

All other eleven jurors answered that they had not read the article. The Court thereupon denied the motion and following the closing arguments again admonished the jury that they were permitted to consider only the evidence as presented in open Court and were not to consider or be influenced by any article which might have appeared in any newspaper or other publication. The Court in its instructions also told the Jury: "Under the law the defendant in a criminal case is not required to testify in his own behalf. He may do so, or not, as he chooses. The failure of any defendant to take the stand as a witness in his own behalf must not be considered by you in any way as an element against such defendant, nor be permitted by you in your deliberation to militate against him."

It cannot be denied but that the newspaper article in question was inflammatory and prejudicial in character and its publication prior to verdict, improper and unethical. Its publication could, under some circumstances have brought to naught a long, tedious and expensive trial. Whether the Court should have in this instance declared a mistrial depends upon all the circumstances. A motion of this character is addressed to the sound discretion of the trial Court. United States v. Hirsch, 2 Cir., 74 F.2d 215, Stunz v. United States, 8 Cir., 27 F.2d 575, and the burden is upon appellant to show an abuse of discretion and prejudice to him, United States v. Keegan, 2 Cir., 141 F.2d 248, Shushan v. United States, 5 Cir., 117 F.2d 110, 133 A.L.R. 1040, Welch v. United States, 77 U.S.App.D.C. 317, 135 F.2d 465. If Juror Vincent read the article at all, he could not remember its contents. He said that he read it—that he probably read the article—because he read the Chicago Daily News. Under questioning by the Court he answered that he had read something in the paper about the denial of a motion and that that was all he recalled of the article. Obviously he was thinking of the reference to the Court's denial of a motion for a directed verdict. The Court explained this to the jury in a manner eminently fair to appellant. A juror who reads or hears, but does not remember can scarcely be said to have been influenced or his verdict affected. If the juror read the inflammatory portion of the article at all, it apparently made no impression as he appeared to have no recollection concerning it. We can only assume that the jury answered the trial court's inquiries truthfully, and, so assuming, we find that no juror except Vincent read the article and that Vincent's mind was in no way affected by what he had seen or read. Under such circumstances we think appellant has failed to show prejudice resulting to him from the publication of the article and we hold that there was no abuse of discretion on the part of the trial court in the denial of his motion.

Other assignments of error are made which have had our consideration, but none warrant a reversal. The judgment of the District Court is

Affirmed.