James A. Day, Appellee, v. Charles M. Thomson, Trustee, Chicago and Eastern Illinois Railway Company, Appellant.

October term, 1939. 1940.    Heard in this court at the Opinion filed March 9,

WHITNEL, BROWNING, LISTEMAN & WALKER, of East St. Louis, for appellant; KENNETH L. RICHMOND, of Chicago, of counsel.

JOSEPH B. McGLYNN, of East St. Louis, for appellee; JOHN J. HOBAN, of East St. Louis, of counsel.

MR. JUSTICE DADY delivered the opinion of the court.

On June 22, 1939, in the city court of East St. Louis, a jury returned a verdict in the sum of $35,000 in favor of the plaintiff, James A. Day, who is the appellee, and against the defendant, Charles M. Thomson, trustee, Chicago and Eastern Illinois Railway Company, appellant, for personal injuries alleged to have been sustained by plaintiff. Defendant's motion for

a new trial was overruled and judgment was entered on the verdict.

For the purpose of this opinion we do not deem it necessary to make any detailed statement of the facts on the merits of the case.

Plaintiff's injuries were alleged to have been received on August 30, 1938. The amended complaint on which the case was tried was filed May 16, 1939. Defendant was ordered to file answer by June 5th, on which day such answer was filed. On June 13, 1939, defendant's motion for a continuance was overruled. On June 19, 1939, such motion for a continuance was again presented and again overruled and the case was called for trial. Thereupon all the jurors in the court room were sworn to answer questions on their *voir dire* and twelve jurors entered the jury box. Before any juror was examined, defendant's counsel presented a written challenge to the array of jurors and moved that the entire venire be quashed and that the jury be discharged for reasons stated in such motion. This motion was overruled.

Inasmuch as this case is to be reversed and remanded for a new trial on other grounds, it will serve no useful purpose for us to pass upon or discuss the question of the propriety of the action of the court in overruling such challenge and motion.

The challenge was made in the presence of the jurors, but immediately, at the request of counsel for the defendant, the court directed the jury to leave the court room and to "take seats across the hall until called." Thereupon counsel for defendant, in open court, proceeded to introduce evidence in support of the motion. As soon as the first witness had given his name, residence and occupation, the following took place in open court:

"The Court: This is not clever practice. Our Bar Association has always approved of this manner of selecting jurors and it seems to me it is poor sportsmanship and resorting to improper practices to serve other purposes. As far as I am concerned, I would

just as soon excuse the jury for the term, but it seems to me that it is extremely poor tactics—corporations coming in in violation of our Bar Association understanding and the understanding among lawyers. It has been our practice here for many years to draw our juries in this manner, and this jury is just as good as any jury that could be drawn. This jury was drawn in exactly the same manner as we have been drawing jurors for years and years. The understanding among lawyers has been that it would be considered proper practice and all right. This disrupts the entire term of this court. So far as I am personally concerned, I would just as soon serve the corporations, grant them their desires and continue the whole term of cases.

"Mr. McGlynn: (attorney for plaintiff) If the Court should determine that this jury is improperly drawn, let's all go to work for the summer—let's set all those cases down and try them in July or August when other people are on vacations.

"The Court: Well, that is just what should be done—it would mean trying cases in July. This is very poor sportsmanship, and I am surprised at the action of counsel. The granting of this motion would not serve any real purpose except possibly the ulterior motive of continuance. There have been two or three motions for continuance filed in this case already and when they have been overruled, as a last resort, you bring in this challenge on the ground that we do not use the legal method of selecting our jurors.

"  . . .

"Mr. Whitnel: (attorney for defendant) In view of the remarks of the Court, I suggest—

"The Court: That I disqualify myself?

"Mr. Whitnel: Yes, that's it—in view of the remarks of the court.

"The Court: Let's proceed.

"  . . .

"The Court: You could have advised them that you were going to present such a motion and have prevented them from bringing all these witnesses here.

I am surprised at the tactics of these corporation lawyers. This has always been a court of convenience—we always got our jurors without conforming exactly to the statute—lawyers know that. We have never conformed exactly to the statute and the lawyers knew that, but it has just been a gentleman's agreement that it would be all right and no objection would be made on that ground. Now for the purpose of a continuance and throwing monkey wrenches at the Court for the first time it is challenged, after every other method of continuance had been exhausted—after agreeing at the last term that if the plaintiff would agree to a continuance there would be a trial at this term. Instead of coming in like gentlemen and keeping that promise that plaintiff's counsel relied upon, you let them go ahead, bring in this array of witnesses and then present this challenge to the array. It is not ethical—it is not proper. If the plaintiff's lawyers were to do that, you would want to have them disbarred. But if corporation lawyers do that, it is proper practice. It is not sportsmanlike. It is not ethical. It is not good practice to resort to such tactics to gain your purpose. In my presence Mr. Walker agreed at the last term that if it would be continued that term, it would be set the first day for this term and you would be ready for trial. It was set the first case and the plaintiff got ready and brought out-of-town witnesses. So I say that resorting to these methods is not proper—not sportsmanlike and not good practice.

''We have never attempted to conform to the letter of the statute. That has long been antiquated and this is probably the last jury we will have to get this way. You gentlemen have proven one thing. Your word is not any good. You agreed to give them a trial at this term and your word is not binding. I would not have the nerve to resort to such tactics as you gentlemen have resorted to. If I were to make an agreement with a lawyer, I would certainly keep it at

any cost. One of the things that was said about old Alexander Flannigan, with all his faults, was that whenever he made an agreement with a fellow lawyer he kept it. You gentlemen, by filing this motion, have not kept the promise you made in my presence.''

Evidence in support of said motion was concluded in the forenoon. As soon as court convened after the noon hour counsel for defendant filed and presented a petition for a change of venue from the judge. The attorney for the plaintiff said he desired to offer evidence on the challenge and the court said, ''Very well,'' and the hearing continued without the petition for a change of venue being passed on.

At the conclusion of such evidence the challenge was denied. Thereupon the petition for a change of venue was again presented and was denied. Thereupon one medical witness testified for the plaintiff and court adjourned until the following morning.

As soon as court convened on the following morning counsel for defendant presented to the court a written motion verified by counsel, which motion stated that when court adjourned the previous night the jurors were permitted to separate and go to their respective homes for the night; that six of such jurors resided in the city of East St. Louis; that there was only one daily newspaper edited and published in said city, and that such newspaper had a daily circulation of approximately 14,000, and was sold and read in all parts of the city; that on the front page of the evening edition of said paper there was published on the night of June 19th the article hereinafter referred to, a copy of such article being attached to the motion and made a part thereof; that all jurors hearing said case had an opportunity to read or be informed of the contents of said article, and that defendant verily believed such article was read by or had come, or during the course of the trial would be read by or come to the attention of one or more of said jurors, and that defendant verily

believed that said article had been read and discussed by many persons with whom said jurors would come in contact prior to their return to court on June 20th, and before the conclusion of the trial; that by reason of said facts the jury had become prejudiced towards the defendant and its attorneys. Said motion then prayed that a juror be withdrawn, a mistrial be declared and the cause continued.

The heading of this newspaper article was in bold type and the article was in words and figures as follows:

"ATTORNEYS HERE CHALLENGE ARRAY OF CITY JURORS. Borders Recesses Court to Study Motion Filed by Lawyers.

"Eighty cases docketed for the civil setting this month in city court may be affected by a challenge of the jury array, a challenge made today in the case of James A. Day of Beecher City versus the Chicago & Eastern Illinois railroad.

"If the jury is disqualified in the railroad case, it also may be disqualified in separate challenges that may be made by attorneys in other cases on the docket.

"City Judge William Borders, after raking three attorneys over hot verbal coals, was scheduled to rule on the challenge this afternoon.

"Representing the railroad, Josiah Whitnel, Philip Listeman and Ralph Walker moved to disqualify the venire on grounds that statutes require the board of supervisors to draw new jury lists every two years; that the county clerk must be present when the venires are drawn from a master list; and that there should be a formal written order in city court requesting a venire.

" 'I'm surprised at the tactics of these corporation lawyers,' Judge Borders declared. 'This case was continued on agreement that the defense would be ready for trial this session. The promise was made in my presence. The statute providing for jury selection is antiquated. You resort to technicalities. Court is recessed until 1:30.'

"Whitnel declared he knew nothing of any promise made by Walker to be ready for trial this setting. At one time two lawyers and Judge Borders were talking at the same time. Joseph McGlynn, counsel for the plaintiff, said 35 witnesses had come from as far as Beecher City, and that the plaintiff should have been notified the venire would be challenged."

This was the only evidence offered on such motion by either side.

Thereupon the court denied the motion and the trial proceeded and continued to and was concluded on June 22, 1939.

It is fundamental that every litigant, regardless of the amount involved, is entitled to a fair trial. The amount of the verdict shows the importance of the case. There was a sharp conflict of testimony as to the extent of plaintiff's injuries and on the question of liability. Therefore it was important that the jury be not prejudiced by any improper influence. It is not debatable that the attorney for the defendant had the legal right to challenge the array of jurors and obtain a ruling of the court on such challenge. He made this challenge at the first opportunity provided by law (*St. Louis & S. E. Ry. Co. v. Wheelis*, 72 Ill. 538). The motion was not frivolous but was based on debatable grounds. Defendant's attorney made this challenge and motion in an orderly manner and he then proceeded to introduce his evidence in support of the challenge. It was the duty of the judge to allow or deny the motion. Instead of merely passing on the motion the judge severely criticised and denounced counsel, accusing counsel of improper and unethical practices and of poor sportsmanship and telling them "Their word wasn't any good." Not only did the court criticise counsel, but also said in effect that it was "Poor tactics for the defendant corporation coming in in violation of the bar association understanding and the understanding

among lawyers,—in such a way as to disrupt the entire term of court.''

These remarks of the court were commented on and in part published in the newspaper article. Common sense tells us this newspaper article was undoubtedly read by some if not all of the jurors, and common sense and experience tells us that the jurors, while they were hearing the case, must have heard about and discussed the judge's remarks.

In passing upon the effect of a newspaper article the court in the case of *Meyer v. Cadwalader*, 49 Fed. 32, said: ''It is idle to say that there is no direct evidence to show that the jury read these articles. They appeared in the daily issues of leading journals, and were scattered broadcast over the community. The jury separated at the close of each session of the court, and it is incredible that, going out into the community, they did not see and read these newspaper publications. That these published statements were well calculated to prejudice the jury against the plaintiffs and deprive them of a fair trial is a proposition so plain that it would be a sheer waste of time to discuss it. Good ground, therefore, here appears for setting aside the verdict.'' The *Meyer* and other cases are cited and quoted from in the case of *Trohey v. Chicago City Ry. Co.*, 168 Ill. App. 1.

The remarks of the trial judge and the newspaper article must be considered together in determining whether the defendant had a fair trial. In our opinion these remarks in connection with the newspaper article were so prejudicial as to deprive the defendant of a fair trial.

No other question has been raised which we feel it necessary to pass upon in order that the case may be fairly tried in the trial court. The case is reversed and remanded for a new trial.

*Reversed and remanded.*