## BUCHER v. KRAUSE.

### No. 10552.

United States Court of Appeals
Seventh Circuit.

Dec. 12, 1952.

Rehearing Denied Jan. 24, 1953.

John J. Mortimer, Arthur Magid, Simon Herr, Marvin J. Peters, Chicago, Ill., L. Louis Karton, Head of Appeals and Review Division, Chicago, Ill., of counsel, for appellants.

Charles Keith Shay, John F. Cashen, Jr., Chicago, Ill., Dallstream, Schiff, Stern & Hardin, Albert E. Hallett, Chicago, Ill., of counsel, for appellee.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

On Saturday, September 24, 1949, about 1:30 a. m., plaintiff, William G. Bucher, was seated alone at the bar of the Clover Bar Lounge, on North Clark Street in the Chicago loop, drinking beer and listening to piano music provided as entertainment for the patrons. He had arrived in the city about three hours earlier, flying from Tulsa, Oklahoma, his home, whence he had come to marry his then fiancee, now his wife. After calling the young lady by telephone and searching for a place to lodge, he registered at the Astor Hotel, adjoining the

Clover Bar, where he deposited his belongings. He then decided to have a bottle of beer before retiring.

Defendants Krause, Higgins, McManus and Miller were plain clothes police officers of the city. At about 12:30 a. m. on Saturday, September 24, they had questioned one Crutale, a suspected hold-up man, with reference to his participation in a robbery. In the course of their investigation, the officers were told, so they say, that the gun Crutale possessed had been obtained from a person identified only as "Nick", with whom Crutale had an appointment to be kept shortly at the Clover Bar; that, following the meeting, he and "Nick" intended to go out "on a couple of jobs"; that "Nick" was a white man, 27 to 29 years of age, about five feet, ten inches in height, weighing about 165 pounds, who generally wore a grey, checked sport jacket, frequently drank beer and was usually armed with a revolver which he carried in his belt; that Crutale had spoken to "Nick" by telephone a short while before, having called him at the Clover Bar; that the person who had answered the 'phone was not "Nick" but had known the latter well enough to call him to the receiver.

Equipped with this information the officers proceeded to the bar. Once there, they decided that Krause and Higgins, because they looked less like policemen, would enter the tavern in search of "Nick", while Miller and McManus would stand guard outside.

The bar in this tavern is oval shaped. Upon entering, Krause and Higgins separated, each walking along one side of the bar. When they met, they stood momentarily, observing the patrons. They saw plaintiff sitting alone. He appeared to fit the description they say they had obtained from Crutale. At no time did they inquire of the employees of the tavern or anyone else as to the identity or presence of "Nick" or the identity of plaintiff.

Krause and Higgins "closed in" on the unsuspecting plaintiff listening to the music, the former from plaintiff's left, the latter from his right, both from behind him. Krause grabbed his left arm, Higgins his right. They either failed to announce their purpose or, if they did so, talked in such a low tone as to be inaudible to plaintiff over the noise of the piano and the crowd. Plaintiff reacted violently. He doubled over and attempted to push himself away from the bar. Twice he wrenched his right arm free of Higgins, thinking he was being held up, as he said, and reached for his wallet in his left hip trousers pocket. In so doing he placed his right hand inside his jacket on the left side. On plaintiff's second attempt to protect his wallet, Krause acted with dispatch. He reached inside his inside right topcoat pocket, where he was carrying a revolver, and fired the gun from inside the pocket. The bullet passed through plaintiff's buttocks, injuring him seriously and permanently. The struggle was, thereafter, short-lived. Plaintiff was stretched out on the floor. He asked why he had been assaulted, but received no reply. He was searched by Krause and Higgins, and found to be unarmed. Indeed, instead of a weapon, the officers found a wealth of convincing identifying material, including a social security card, driver's license, Naval Reserve card and an American Airlines ticket, all showing convincingly that plaintiff was not the mysterious "Nick" but rather William G. Bucher, a resident of Tulsa, Oklahoma. By this time Miller and McManus had entered the room and they, too, soon learned that plaintiff had been shot and was not the object of their quest.

Thereafter plaintiff was removed to Henrotin Hospital, where his wounds were dressed for the time being. Thence he was taken to the Cermak Memorial Hospital attached to the House of Correction, a penal institution maintained by the city and supervised by defendant Sain, as warden. He remained in this hospital for some ten hours, during which time he received further treatment. At about eight o'clock in the morning of September 24, 1949, Krause and Miller visited him. They took his written statement and, upon his inquiry as to why he was being detained, informed him that he was "being held for suspicion as a robbery suspect." Crutale, the accused hold-up man, was then brought to plaintiff's

bedside, asked whether plaintiff was "Nick" and stated unequivocally that Bucher was not "Nick."

Plaintiff's fiancee was unaware of the early morning happenings for, despite repeated requests by Bucher that she be notified, no effort was made to make contact with her. Consequently she arrived at the Illinois Central Suburban Station, at Randolph Street and Michigan Avenue, at nine o'clock, intending to meet plaintiff. From there they were to proceed to obtain their marriage license. She waited until 10:15 a. m. repeatedly calling her home seeking information as to plaintiff's whereabouts, and then went alone to the Marriage License Bureau. There she waited for another hour and a half, again making repeated telephone calls to her home. About noon she was called into the office of the license clerk, where she learned for the first time of the whereabouts of her fiance. She was allowed to sign a license application and then departed to make final preparations for her wedding, scheduled for that afternoon.

A newspaper photographer, who had been present when the young lady was informed of the events of the night before, and a license clerk then went to the Cermak Hospital, where Bucher signed the application; the marriage license was then issued. Upon his release from the hospital, at about 2:30 p. m. plaintiff was taken into custody by two uniformed policemen, who took him to the 37th District Police Station of the City of Chicago, to which Krause, Higgins, Miller and McManus were assigned. There he was interviewed by defendant Goldberg, the District Captain, who informed him that the entire affair had been a regrettable mistake but that he would have to be "booked" for resisting arrest and could remain at large only upon posting a $50 recognizance. However, plaintiff was advised that he would be required to appear in the Municipal Court on Monday, September 26, to answer to the charge of resisting arrest. Plaintiff posted his bail money, was released, and carried out his marriage plans, albeit somewhat tardily.

Plaintiff appeared in court on Monday upon a charge of resisting arrest. He was tried by the court, Judge Cecil Smith, who, during the course of the trial, asked Assistant Corporation Counsel Barth, if there was a fund out of which plaintiff could be compensated. When counsel stated that he did not know, Judge Smith ordered a recess for the purpose of ascertaining whether such a fund existed. During this recess, plaintiff was approached by Krause and Higgins and a third man, who purported to be an attorney and who volunteered to plaintiff the advice that he had no cause of action against the police officers. The Assistant Corporation Counsel then presented to plaintiff a typewritten release, which recited that Bucher released and discharged the City of Chicago and its officers from all claims arising out of his "arrest, detention and accidental shooting", in consideration of the voluntary dismissal of the action, City of Chicago v. William G. Bucher. Plaintiff, urged by the purported attorney, signed the release. At the conclusion of the trial, a judgment of not guilty was entered and plaintiff was refunded the $50 he had deposited.

A few days later plaintiff and his wife returned to Oklahoma. He underwent continued treatment for his wounds from the time of his release from Cermak Hospital to the date of the trial.

Plaintiff filed suit in the District Court, seeking damages of $100,000, relying for jurisdiction upon diversity of citizenship. The complaint was in two counts. The first charged Krause, Miller, Higgins and McManus with intentional assault or, in the alternative, with negligently shooting plaintiff. The second averred that these four defendants were guilty of false arrest and unlawful search for and seizure of plaintiff's personal property; that defendant Sain was guilty of false imprisonment by reason of plaintiff's detention in Cermak Hospital; that defendant Goldberg was guilty of false imprisonment because of his detention of plaintiff at the Police Station and in threatening to detain him further upon a charge of resisting arrest unless he gave bond. The cause was tried by a jury, which returned a verdict of guilty as to all defendants in the sum of $50,000 on the first and $65,000 on the sec-

ond. On plaintiff's motion a remittitur of $15,000 was entered on count two and judgment in the sum of $50,000 was entered on each count. This appeal followed.

Some of the numerous assignments of error go to the sufficiency of plaintiff's proof, while others are concerned with alleged error in the court's rulings. Some are deserving of comment; others, we think, are clearly without merit. We turn first to the sufficiency of the proof introduced under each count, as applied to the respective defendants.

The crux of the first count, indeed, as will appear presently, of count two as well, is the asserted illegality of the "arrest" by Krause and Higgins. The officers had no warrant. The substantive question, therefore, is when, under Illinois law, a police officer, not armed with a warrant, may arrest an individual, *i. e.* under what circumstances is an officer authorized to act without exposing himself to liability for false arrest. The Illinois statutes provide that "An arrest may be made by an officer * * * without warrant, for a criminal offense committed or attempted in his presence, [or] * * * when a criminal offense has in fact been committed, and he has *reasonable ground for believing that the person to be arrested has committed it.*" Ill.Rev.Stat.1951, c. 38, § 657. The Municipal Code of the City of Chicago seems to enlarge this power somewhat by providing that an officer may also "arrest any person found under circumstances which would warrant a *reasonable man in believing that such person * * * is about to commit a crime.*" Municipal Code of Chicago, c. 11, Sec. 11–25. (Emphasis supplied.)

If we assume, as defendants contend, that Crutale and "Nick" had committed a crime, the pivotal question emerges: Were Krause and Higgins acting as reasonable men when, as they say, they "believed that the person arrested *i. e.* plaintiff, committed it"?

It was certainly not enough for Krause and Higgins to believe that a lawbreaker was present in the Clover Bar. Rather, to excuse their action, they must have been justified in concluding that plaintiff was the person they sought, for, if this were not the test, it would be permissible for police officers to arrest all of the patrons of a given establishment upon information that some unidentified one of them is a fugitive.

Whether the officers were acting reasonably when they attempted to place plaintiff under arrest is, under Illinois decisions, one of fact. Thus, in People v. Davies, 1933, 354 Ill. 168, 176, 188 N.E. 337, 340, the court said: "Mere suspicion is not sufficient to justify an arrest. Whether or not the officer making the arrest in a given case had reasonable grounds for making the arrest is always a mixed question of law and fact. The facts are determined by the circumstances in evidence as to whether or not the grounds on which the officer acted were reasonable. The law is determined by the sufficiency of such facts." We interpret this as meaning that the court will first determine whether the trier of facts would be justified in finding that reasonable grounds existed for the arrest. If evidence supporting such a conclusion is present but is controverted or if it will support a contrary inference, then the question must be submitted to the jury.

By its verdict this jury found that Krause and Higgins had not acted as reasonable men when they arrested plaintiff, that is, their alleged belief that plaintiff was the person they sought was not reasonably founded. We can inquire only as to whether this verdict was so unreasonable that it must be set aside, *i. e.* as to whether there was adequate, substantial evidence to support it. The facts, as previously stated, find adequate support in the evidence. Assuming that the jury found them to be as we have narrated them, we think it was fully justified in finding that they reflected unreasonable conduct on the part of the two officers. It is apparent that Krause and Higgins did not utilize all of the information at their disposal. They say they had been informed by Crutale that he had telephoned "Nick" at the Clover Bar; that someone other than "Nick" had answered and had called "Nick" to the receiver. Thus they were aware that some person in the bar could point out "Nick". How-

ever, upon their arrival, they made no inquiry as to his identity or presence. Instead, in singling out plaintiff, they relied solely on the description which they claim had been given them by the admitted criminal, Crutale. It seems obvious that the jury acted entirely within its scope of authority as trier of the facts when it held this conduct unreasonable.

▮ In addition, we think that the circumstances were such as to warrant the jury in completely disbelieving defendants' testimony as to the positive nature of Crutale's description of "Nick". First, though McManus testified that he had made a pencil notation of the description, he was unable to produce it. Second, the only statement signed by Crutale with reference to the description supposedly given to defendants was executed at 2:02 p. m. on Saturday, more than twelve hours after the shooting and a like period of time after the officers had discovered their mistake. With these circumstances before them, the jury may quite reasonably have concluded that defendants were never possessed of this positive description of their quarry; that even this basis for their conclusion that plaintiff was "Nick" was lacking; that in fact they seized and shot plaintiff on "mere suspicion," a wholly inadequate basis for action under Illinois Law. People v. Davies, supra.

The arrest of plaintiff by Krause and Higgins having been determined to have been unreasonable and therefore unlawful, it necessarily follows that they were also guilty of misconduct in employing excessive force to subdue him. Of course, while Krause alone shot plaintiff, Higgins, cooperating in the unlawful seizure, was equally responsible for plaintiff's injuries.

▮ However, we are of the opinion that Miller and McManus can not be held legally accountable for the tort set forth in count one. True, all four officers charged in that count with unlawfully seizing and shooting plaintiff embarked together on the venture. But their visit to the tavern was not improper. Though when Krause and Higgins entered, Miller and McManus knew the purpose at hand, this is no reason why they should have been bound to anticipate that the consequence of the visit would be an unlawful arrest. On the contrary, it was only reasonable, we think, for them to assume that any action taken by Krause and Higgins would be legally proper. Surely they might have reasonably expected that Krause and Higgins would acquire an identification of their suspect before making any arrest. This, then, is not a case like that of Ously v. Hardin, 23 Ill. 352, 353 (1860), relied upon by plaintiff for the proposition that all who participate in, or aid and abet in an assault are equally liable. There the defendant, charged with the malicious intent of his co-defendant, was shown knowingly to have combined with his co-defendant "for a bad purpose." Such cannot be said of Miller and McManus with reference to the averments of count one. As to that count, the judgment against Miller and McManus must be reversed.

Count two charged defendants Krause, Higgins, Miller and McManus with (1) unlawful search of plaintiff's person and unlawful seizure of his personal property; and (2) false arrest and imprisonment of plaintiff. After plaintiff had been assaulted and shot, McManus and Miller entered the tavern and joined the other two. The jury was justified in finding that thereafter all four defendants acted in concert with respect to the treatment extended plaintiff; in seizing his personal effects and continuing to hold them and in taking him into custody and placing him in the hospital affiliated with the House of Correction, where he was later falsely informed that he was being held as a robbery suspect. The jury, having found that the initial arrest by Krause and Higgins was unlawful, it necessarily follows that the search of his person, the seizure and continued holding of his personal property, his continued personal detention under a criminal charge, all incidents flowing from the arrest, were likewise unlawful. This aspect of the verdict, then, we have no right to disturb.

▮ With respect to Sain, count two averred that he was guilty of false imprisonment by reason of his forceful and wrongful detention of plaintiff at the hos-

pital connected with the House of Correction. Sain was asleep at the time plaintiff was brought in; he was unaware of plaintiff's presence until just prior to the latter's release. Sain urges that he was under a duty to accept all persons brought to the hospital for medical care and, assuming he did know of plaintiff's presence, unable to order the latter's release until it was authorized by the physician in charge. Plaintiff contends that as Sain, as Superintendent of the House of Correction, was in "entire control and management of all its concerns", he was "responsible for the manner in which said house of correction [was] managed and conducted", and under a duty to "reside at said house of correction, devote all his time and attention to the business thereof, and visit and examine into the condition and management of every department thereof and of each prisoner therein confined, daily." Ill.Rev.Stat.1951, c. 67, § 7. See also Mun.Code of Chi., Secs. 24–3, 24–5 (1949). Plaintiff further asserts that he was unlawfully received at the hospital. He urges that the hospital was a department of the House of Correction and that no person may properly be confined therein without a prior order to that effect issued by a court of competent jurisdiction. Ill.Rev.Stat.1951, c. 67, Sec. 1; Mun.Code of Chi., Sec. 24–5 (1949). From these statutory provisions, plaintiff argues that Sain was responsible for his detention, which was, in turn, unlawful because it was not in pursuance of a proper court order. Though this argument may have merit in the abstract, its application in this instance would, it seems to us, result in gross injustice to Sain. Plaintiff was brought to the hospital in a wounded physical condition. He had been shot, and further treatment of his wounds was necessary. While there is evidence that the proper place for the officer to have taken him was Cook County Hospital, it seems only proper that, upon his arrival at Cermak Hospital, the authorities there should receive him and administer to his wounds. To hold the warden accountable for plaintiff's detention under these circumstances, merely because of his supervisory authority, upon a charge of inten-

tional tort of false imprisonment, would be, we think, unjustified.

Count two charged defendant Goldberg with false imprisonment of plaintiff by reason of his detention at the 37th District Police Station, and the threat of continued detention unless plaintiff posted a $50 recognizance. The evidence against Goldberg was unequivocal. He interviewed plaintiff at the police station, stating that the matter was most regrettable. He then had plaintiff "booked" for resisting arrest. In order for plaintiff to gain his freedom, it was necessary that he deposit $50 in cash to assure his reappearance. In view of the illegality of plaintiff's arrest, his continued detention under a charge of resisting that arrest was unlawful. There can be no doubt that the jury was fully justified in finding Goldberg guilty under count two.

Shortly after plaintiff had testified in the trial that Goldberg had charged him with resisting arrest, a question arose as to the admissibility of certain evidence. The jury was excluded from the courtroom during argument, in the course of which the following occurred:

"By the Court: Well, what did they do to this man after the arrest?

"By Mr. Peters: They took him to the hospital for treatment.

"By the Court: They took him to the hospital, and they kept him, and then they had him charged with a misdemeanor.

"By Mr. Herr: That's right.

"By the Court: Outrageous, I say."
This transpired on Thursday. On Friday afternoon, the court recessed until the following Monday and the jurors were allowed to go to their homes. The weekend editions of three newspapers carried accounts of the court's comments. On Monday morning, when court reconvened, defendants' counsel presented a motion for mistrial based upon the trial judge's remarks and their subsequent publication. Thereupon the judge asked each juror: "Have you read any of the articles which appeared in the Chicago Tribune, the Chi-

cago Daily News and the Chicago Sun-Times on last Friday and Saturday relating to the trial of this case?" To this three jurors replied that they had read "just the headline". The headlines read as follows: "U. S. Judge Raps Police Captain"; "Charges Duress in Court After Cops Shot Him"; "Police Captain Reprimanded in Shooting". Plaintiff then moved that the three jurors be further interrogated in order to ascertain what they had read and whether they had been prejudiced. Defendant objected to further questioning, contending that adequate grounds for mistrial had already been shown. The motion was then denied and, in his charge, the trial judge meticulously instructed the members of the jury that they should not be influenced by anything they might have read in newspapers but should decide the case only on the evidence presented in court.

■■ Inasmuch as the comments of the court were not made in the presence of the jury, we can not attribute to them the prejudicial error found to exist in Day v. Thomson, 305 Ill.App. 29, 26 N.E.2d 429; Sprinkle v. Davis, 4 Cir., 111 F.2d 925, 128 A.L.R. 1101. Here the comments could have been communicated to the jury only by the newspapers which gave them publication. Were they so communicated? Three jurors admitted that they had read a headline. But we do not know which one; whether it was one which indicated that the court had reprimanded Goldberg, or one which stated: "Charges Duress in Court After Police Shot Him." Before this court can conclude that prejudicial error occurred, it must be shown that prejudicial matter was communicated to the jury. U. S. v. Carruthers, 7 Cir., 152 F.2d 512, 519. Defendants were offered opportunity to learn the facts by the proposed further interrogation of the jurors; of this they refused to take advantage. As a result, we cannot say that the trial court abused its discretion.

■ Defendants further insist that the trial court erred in refusing to grant their motion that plaintiff submit to a physical examination. Federal Rules of Civil Procedure, rule 35(a), 28 U.S.C., provides that the trial court "may order" a physical examination of a party whose physical condition is in issue. It is clear that whether such a motion should be granted rests in the sound discretion of the court. We find no abuse of discretion here.

■ Plaintiff introduced in evidence, over defendants' objection, certain letters between himself and the Assistant Corporation Counsel of the City of Chicago relating to the existence of a fund out of which plaintiff might be compensated. It will be recalled that Judge Smith had inquired whether such a fund existed. Defendants urge that these documents constituted offers of compromise and, consequently, should not have been admitted in evidence. Reading the letters, it is obvious that they constituted no such offer. No mention is made of a release, discharge, or other settlement of any controverted demand. Their admissibility was not soundly challenged. Lewis v. U. S., D.C., 17 F. Supp. 543, 546, affirmed Saunders v. Commissioner of Internal Revenue, 10 Cir., 101 F.2d 407; 15 C.J.S., Compromise and Settlement, § 1, p. 711. Furthermore, they were relevant to the issue of duress, by which plaintiff sought to avoid the consequence of the release he had signed, for they served to reflect his state of mind.

■ Plaintiff introduced in evidence all of the identifying matter he carried on his person the night of the shooting. Defendants objected generally to its receipt. On appeal, they assert that it should have been received subject to a limitation that it be considered only with reference to their conduct following the shooting. By this position defendants admit the relevancy of the documents. If evidence is admissible for any purpose, no error can arise on a general objection. If defendants desired a limitation on the consideration of the evidence they should have so requested.

■ Defendants object to the trial court's instruction that punitive damages might be awarded against any or all defendants. Defendants assert that there was no evidence of malice or intentional wrong upon which punitive damages could

be premised. We do not agree. In Illinois punitive damages may be awarded when a wrongful act is performed with reckless disregard for the rights of others. Lindquist v. Friedman's, Inc., 1937, 366 Ill. 232, 238, 8 N.E.2d 625. Certainly the evidence justified the jury's finding of such conduct upon the part of Krause and Higgins in their assault on plaintiff. Furthermore, we think the jury could properly conclude that Krause, Higgins, Miller, McManus and Goldberg were guilty of malicious conduct in their actions subsequent to the shooting. The formal arrest of plaintiff, after his identity was learned, on a wholly unjustified suspicion of robbery, and the lodging of a complaint against him for resisting arrest, may well have conveyed to the jury the odor of a "cover-up". Defendants had been immediately apprised of their mistake. Instead of admitting their error, they scrambled for something to justify it. They sought to impress unfairly upon plaintiff's mind that he, too, had committed a wrong of some nature. It is disheartening to be confronted with circumstances justifying such an inference from the conduct of a group of police officers.

In view of the reversal of the judgment against Sain, we need not consider defendants' assertion that punitive damages erroneously assessed against one of several joint defendants vitiates the judgment as to all.

 Defendants insist that there was no evidence of duress in the execution of the release or of failure of consideration therefor and that, therefore, those issues should not have been submitted to the jury. The concept of duress by imprisonment is old in the law. See Baker v. Morton, 12 Wall. 150, 79 U.S. 150, 20 L.Ed. 262. But, say defendants, plaintiff was not imprisoned at the time the release was signed. True, on Saturday he had been conditionally released upon posting his recognizance; but he was bound to appear in Municipal Court on Monday. This he did, and, in so doing, again became subject to defendants' control. His freedom was then again at an end; he was faced with a criminal charge. He was, for all purposes here involved, effectively restrained at the time he signed

the release. At least the evidence was such that the jury could have so found; the issue was properly submitted to it.

 This is true also of the issue of consideration for the release. The bargain recited in that instrument was, in essence, that the city would voluntarily dismiss a contested cause of action against plaintiff in return for plaintiff's release of a disputed claim against defendants. There was evidence, (the docket sheets of the Municipal Court), that the city failed to perform its part of the alleged bargain, for the court records recite that plaintiff was tried and found not guilty of the charge against him. Consequently, inasmuch as the evidence was sufficient to support a finding that the city gave nothing in return for the release, the issue was one for the jury.

 Defendants assign numerous alleged errors with regard to the charge to the jury and complain also of the rejection of tendered instructions. It is unnecessary to indulge in any lengthy exposition of these assignments. It is sufficient to observe that the charge adequately presented the law covering false arrest, false imprisonment, unlawful search and seizure and validity of the release. The court carefully admonished the jury to decide the case only upon the evidence presented in court. It explained with clarity the charges leveled against each defendant, in each count. It advised the jury that plaintiff was bound to prove his case by a preponderance of the evidence. Read as a whole, the charge is competent, adequate and fair and reflects no prejudicial error.

We turn finally to the verdict and the resultant judgment. The error assigned in this respect is predicated upon the trial court's denial of defendants' motion for a new trial, which, it is asserted, was an abuse of its discretion. Admittedly the verdicts, $50,000 on each count, were large, indeed, bountiful; consequently, we must determine what supervisory control, if any, an appellate court may exercise over the amount of a general verdict in a tort action such as this, where both compensatory and punitive damages are proper elements.

It has been the policy of this court to refrain from interference with general tort verdicts claimed to be excessive. See Wetherbee v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 191 F.2d 302, 309; Flener v. Louisville & N. Railroad Co., 7 Cir., 198 F. 2d 77, 80; cf. Feinsinger v. Bard, 7 Cir., 195 F.2d 45. If we are to depart from this position, we must first ascertain whether we have the power to do so.

We look, initially, to the function of the trial judge, for it is his action upon which the assignment of error is based. As early as 1822 Judge Story, in Blunt v. Little, C.C., Fed.Cas. No. 1578, page 761, 3 Mason 102, defined his conception of the role of the trial judge in this language: "* * * the court may grant a new trial for excessive damages. * * * It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case." This language was approved in Arkansas Valley Land & Cattle Co. v. Mann, 130 U.S. 69, 73, 9 S.Ct. 458, 32 L.Ed. 854, and has become, we think, horn-book law. It is clear then that the trial judge must exercise a sound discretion in deciding a motion for new trial based upon an alleged excessive verdict.

Specifically, we are interested here in the extent, if any, to which the exercise of this discretion is reviewable by an appellate court. An old procedural impediment forbidding review of an order denying a motion for new trial no longer bars judicial review. See Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 482, 53 S.Ct. 252, 77 L.Ed. 439; Wetherbee v. Elgin, Joliet & Eastern Ry. Co., supra.; Rule 75, Fed.Rules of Civ.Proc. 28 U.S.C. However, the underlying reason for the former controlling rule was not always clearly stated, with the result that generalizations to the effect that appellate courts may never review an order denying a motion for new trial were contained in many opinions. See Chicago & N. W. Ry. Co. v. Green, 8 Cir., 164 F.2d 55; Chicago N. W. Ry. Co. v. Kelly, 8 Cir., 74 F.2d 31.

Indeed, there are still some comparatively recent decisions denying the right to review the exercise of the trial court's discretion. Scott v. Baltimore & O. R. Co., 3 Cir., 151 F.2d 61; McCoy v. Cate, 1 Cir., 117 F.2d 194. Some of these cases appear to reach the rather astounding conclusion that there is no power to review an alleged abuse of the lower court's discretion. Recognizing the emasculatory effect of such a doctrine on their reviewing function, some courts have resorted to "accepted" bases of review. Thus, in Earl W. Baker & Co. v. Lagaly, 10 Cir., 144 F.2d 344, 154 A.L.R. 1098 and Snowden v. Matthews, 10 Cir., 160 F.2d 130, the court indicated that passion and prejudice on the part of the jury could, in the case of an excessive verdict, be inferred from the enormity of the sum awarded. This court has rejected such a rationale. See Wetherbee v. Elgin, Joliet and Eastern Ry. Co., supra and cases there cited. Another inventive process offered to justify review is found in Sinclair Refining Co. v. Tompkins, 5 Cir., 117 F.2d 596, wherein it was held that any large verdict will always impel a careful search of the record for prejudicial error. Such an approach we think is misleading, for the existence or non-existence of procedural error in the trial of a cause should seldom be decisive of the propriety of the size of the verdict.

There are, however, many decisions of relatively recent date, with which we find ourselves in accord, which meet head on the problem at hand and conclude that a court of review may, with propriety, ascertain whether the trial court abused its discretion in failing to grant a new trial because of an excessive verdict. Cobb v. Lepisto, 9 Cir., 6 F.2d 128; Southern Pac. Co. v. Guthrie, 9 Cir., 180 F.2d 295, on rehearing, 9 Cir., 186 F.2d 926, certiorari denied 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343; Covey Gas & Oil Co. v. Checketts, 9 Cir., 187 F.2d 561; Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 4 A.L.R. 2d 1064; see also, Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 190 F.2d 825, 830; Consumers Power Co. v. Nash, 6 Cir.,

164 F.2d 657, 660; dissenting opinions of Judge Holmes in Sunray Oil Corp. v. Allbritton, 5 Cir., 187 F.2d 475, on rehearing 188 F.2d 751. These decisions, we believe, are representative of the correct view with respect to appellate authority to review the trial court's discretion. If that discretion be abused, this court will not be powerless to act.

The question still remains, however, as to whether the power should be exercised in the present case. In undertaking this determination we are, in many respects, on an uncharted course, for damages assessed by a jury are largely discretionary with it. Thus, to reverse the judgment we must conclude that the trial court has abused its discretion in failing to conclude that the jury abused its discretion in returning a verdict of the magnitude of the one here involved. Judge Learned Hand considered this problem in Miller v. Maryland Casualty Co., 2 Cir., 40 F.2d 463, 465, where he said: "We must in effect decide whether it was within the bounds of tolerable conclusion to say that the jury's verdict was in the bounds of tolerable conclusion. To decide cases by such tenuous unrealities seems to us thoroughly undesirable; parties ought not to be bound by gossamer strands; judges ought not to engage in scholastic refinements." Since this statement, little has been suggested in the way of concrete guide posts. We are told that if the verdict is "grossly excessive," Southern Pac. Co. v. Guthrie, supra, or "monstrous," Affolder v. New York, Chicago & St. L. R. Co., 339 U. S. 96, 101, 70 S.Ct. 509, 94 L.Ed. 683, a failure to set it aside is an abuse of discretion. While these suggested premises amount to more than "tenuous unrealites," they are little more than comparatives dependent for their meaning upon the facts of each case, the nature of the damages, the wrong to be remedied.

After full consideration, we conclude that, under the facts of this case, the trial court committed no abuse of discretion in refusing to set aside the verdict. In Illinois the amounts to be allowed both for pain and suffering and for punitive damages are almost, if not quite entirely, discretionary with the jury, provided always that there be adequate credible evidence to sustain the determinations. See Donovan v. Consolidated Coal Co., 88 Ill. App. 589, 598; McNay v. Stratton, 9 Ill. App. 215, 221; Doremus v. Hennessy, 62 Ill.App. 391, 407–408; Chicago & Milwaukee Electric Railway Company v. Ullrich, 213 Ill. 170, 72 N.E. 815. Under count one the jury was certainly justified in awarding plaintiff a subsantial sum for the pain and suffering and other elements of damage resulting from the gunshot wound; the evidence sustained a finding that under both counts actual damages were incurred. However, it is quite clear, we think, that the greater part of the damages allowed under both counts was punitive. In assessing them the jury was rightfully entitled to consider that defendants were police officers charged with atrocious conduct while acting as officers, the inference that the post-shooting conduct was an intentional cover-up, and the demeanor of defendants when they took the witness stand, the last of which elements is in no way available to this court. "Punitive or exemplary damages are such as may be imposed by way of punishment of the wrongdoer and do not to any extent depend upon * * * the amount of actual pecuniary damage sustained, but depend wholly upon the motive, purpose and condition of mind and heart of the wrongdoer and the circumstances and manner of his doing the wrong." Donovan v. Consolidated Coal Co., supra. Quite generally exemplary or punitive damages are said to be awarded, not as compensation but as "smart money," as punishment to the wrongdoer and as a deterrent, warning or example to defendant and others to admonish them not to repeat the wrongful act. See 25 C.J.S., Damages, § 117, p. 705 et sequi and cases there cited. Hence they are, of necessity, peculiarly within the discretion of the jury and of the court presiding at the trial. Id. §§ 117, 126, pp. 708, 737. Consequently, there is no rule prescribing a proportion, ratio or relationship between them and actual compensatory damages. Id. § 126, p. 740. With these well recognized rules in mind, though it may seem

that the jury was severe in the punishment it meted out to defendants, we can not justify a finding that it abused its discretion in so punishing them or that its verdict did not reflect a "tolerable conclusion." On the same reasoning, likewise, we are not warranted in finding that the trial court acted arbitrarily in failing to conclude that the jury acted improperly.

Title 28 U.S.C. § 2106 provides that an appellate court "may affirm, modify, vacate, set aside or reverse" any judgment "brought before it for review" and "may remand the cause and direct the entry of such appropriate judgment * * or require such further proceedings to be had as may be" justified. In pursuance of this authority, when it is obvious that the trial court has abused its discretion in denying a motion for a new trial based upon a claim of excessive damages, this court may reverse and remand with directions to the trial court to grant a new trial unless the plaintiff will make a remittitur to a certain fixed definite amount. This is clear from such cases as Kennon v. Gilmer, 131 U.S. 22, 29–30, 9 S.Ct. 696, 23 L.Ed. 110; Covey Gas & Oil Co. v. Checketts, 9 Cir., 187 F.2d 561; Boyle v. Bond, 88 U.S.App.D.C. 178, 187 F.2d 362; Cobb v. Lepisto, 9 Cir., 6 F.2d 128. But these same decisions make it evident also that the trial court may not of itself arbitrarily reduce the damages; it must afford plaintiff opportunity to make a remittitur if he desires and if he does not choose to do so, grant a new trial. And, we, too, might, in such case, afford plaintiff an opportunity to make a remittitur in this court and, if he should choose not to do so, remand for a new trial. For either the trial court or the appellate court arbitrarily to reduce the damages to a lesser amount is well-nigh to deprive plaintiff of a right to a jury trial. As we have demonstrated, the facts here are such that we can not say as a matter of law that either the jury or the court abused the discretion lodged in them respectively. There being no yardstick, no definite unit of measure, which can be applied to punitive damages, we may not arbitrarily declare the verdict excessive.

The judgments against defendants Miller and McManus under count one are reversed. The judgment against defendant Sain is reversed. In all other respects the judgments are affirmed.