**Richard ROBERTS, Plaintiff-Appellee,**

**v.**

**BALTIMORE AND OHIO RAILROAD COMPANY, Defendant-Appellant.**

**No. 14755.**

United States Court of Appeals
Seventh Circuit.

Nov. 30, 1965.

Cassatt Martz, Indianapolis, Ind., Robert C. Walsman, Indianapolis, Ind., for defendant-appellant.

John H. Himelick, Connersville, Ind., R. Stanley Lawton, Indianapolis, Ind., Evan E. Steger, Indianapolis, Ind., for plaintiff-appellee. Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel.

Before DUFFY, CASTLE and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This action was brought by plaintiff, Richard Roberts, to recover damages for personal injuries sustained when struck by an engine of defendant's freight train. Plaintiff and a companion, Thomas Rayburn, at the time were crossing the White Water River just east of Connersville, Indiana, from west to east, as a short-cut to their homes in East Connersville, using defendant's bridge as a means of crossing.

The case was tried to a jury, which returned a general and special verdict awarding damages to plaintiff in the amount of $95,000, with answers to certain interrogatories submitted at defendant's request. In accordance with the verdict the District Court, on April 1, 1964, entered judgment, from which the defendant appeals.

The case went to trial upon an amended complaint which alleged in separate paragraphs as grounds for recovery: (1) negligent breach of the duty created by the application of the doctrine of last clear chance; (2) operating the train at a speed in excess of a city ordinance; (3) ordinary negligence for failure to warn, lookout, etc., and (4) negligence in the construction and maintenance of the bridge.

Defendant at the conclusion of plaintiff's evidence and again at the conclusion of all the evidence moved for a di-

rected verdict, which was denied. Thereupon, and prior to submission of the case to the jury, paragraphs 2, 3 and 4 were withdrawn, on plaintiff's motion. The Court rejected *in toto* the instructions proposed by the respective parties which were designed to define the issues as they existed prior to plaintiff's dismissal of paragraphs 2, 3 and 4, and furnished counsel with its own instructions relevant to the last clear chance doctrine relied upon in paragraph 1 of the complaint. Prior to submission of the case to the jury, the Court specifically inquired of counsel for both sides if there was any objection to the instructions as proposed, to which all counsel responded in the negative. Thus, defendant expressly acquiesced in the charge as given.

Instruction No. 7 was as follows:

"Ordinarily any negligence on the part of the plaintiff which contributes to his injuries will be a complete defense to plaintiff's suit. There is, however, one exception to this rule known as the 'Last Clear Chance Doctrine,' in which the plaintiff's original negligence is excused or is held not to be the proximate cause of the plaintiff's injuries. The essential elements of a situation to which this doctrine applies are: First: Plaintiff's negligence has placed him in a position of danger from which he cannot free himself; Second: Thereafter, the defendant discovers the plaintiff's position of danger, has the means to avoid the injury, but negligently fails to exercise ordinary care to do so; and Third: Injury proximately results to the plaintiff from such failure on the part of the defendant. If all of the foregoing elements concur in a given situation, then the plaintiff's original negligence will not defeat a recovery."

■ We discern no reason to question that this charge correctly states the law as to the doctrine of last clear chance, as announced by the courts of Indiana and perhaps elsewhere. In any event,

defendant having made no objection in the trial court, it is in no position to question it here. Thus, on this record we treat it as the law of the case, which obviates any necessity of discussing the numerous cases called to our attention which have considered the doctrine.

The record presents a rather confused situation due perhaps to the fact that the case was tried upon a complaint which alleged four separate grounds for recovery, three of which were dismissed just prior to its submission to the jury. That confusion is not ameliorated by defendant on brief in this Court as it relies upon propositions of law which were or might have been pertinent to the issues in the case while it was being tried. For instance, among the contested issues stated and argued by defendant are (1) "Whether or not defendant's bridge was 'frequently and constantly' used by pedestrians as a foot bridge across Whitewater River with 'the knowledge, acquiescence and consent of defendant,'" and (2) "Whether or not, such usage if established, created a status of licensee by user in the general public and in particular in plaintiff, at such time and place." Obviously, such issues bear no relevancy to the doctrine of last clear chance upon which the case was submitted.

■ By invoking the doctrine of last clear chance plaintiff on brief concedes "that he went upon the bridge as a trespasser to whom the defendant owed no other duty, at that time, other than to refrain from willfully or intentionally injuring him." However, as stated in New York, Chicago and St. L. Ry. Co. v. Ault, 56 Ind.App. 293, 298, 102 N.E. 988, 989:

"\* \* \* [that is] if conditions develop prior to an injury which afforded a defendant a last clear chance of avoiding it, the duty to use care to that end immediately arises. It is a duty born of the situation of the parties, and its existence does not depend upon any facts showing a duty in favor of the party injured, prior to the time such conditions arose."

Pertinent issues stated by defendant are: "Whether or not:

(a) Plaintiff's negligence had then and there placed him in a position of danger, from which he could not free himself, and

(b) Defendant's employees upon discovering such position of danger, possessed the means to avoid the injury but negligently failed to exercise ordinary care to do so, and,

(c) Injury proximately resulted to the plaintiff from such failure, if any, on the part of the defendant's employees."

■ In reviewing the record for the purpose of determining whether the evidence was sufficient to justify submission of the case to the jury, we must keep in mind that determination must be made from that most favorable to plaintiff, together with all reasonable inferences which may be deduced therefrom. See Gillam v. J. C. Penney Co., 341 F.2d 457, 460 (CA–7); Lappin v. Baltimore and Ohio Ry. Co., 337 F.2d 399, 402 (CA–7), and Woods v. Geifman Food Stores, Inc., 311 F.2d 711, 713 (CA–7).

That plaintiff was in a position of peril as a result of his own negligence is not in dispute. The question is whether he could have freed himself from such peril. Defendant on brief argues "that plaintiff could easily have reached the east end of the bridge and gotten off the track had he not attempted to hold onto and save a borrowed bicycle; that plaintiff's companion Thomas Rayburn, who testified that before the accident plaintiff could out-run him was at the same place on the bridge as plaintiff but escaped carrying his bicycle, returned to the bridge to get plaintiff to let go of the bicycle and escaped *for the second time* while the train was coming across the bridge. If plaintiff who was, by Rayburn's testimony, more fleet of foot than the latter, had simply dropped the bicycle, he could certainly have gotten off the bridge *once*, since Rayburn got off the first time, went back and got off again for the

*second* time before the train reached them."

This argument overlooks circumstances in proof which are more favorable to plaintiff, and particularly evidence as to his physical condition. Plaintiff suffered from certain birth defects which severely affected his left extremities. At nine months of age his condition was such that the doctors predicted he would not walk. Eventually, however, he did walk, wearing orthopedic devices on his left leg until 1950, when he entered Shriners' Hospital for Crippled Children in Chicago, where he underwent a series of eleven operations, including the removal of bones in his twisted left foot, and surgery in an attempt to correct the difference in length between his normal right leg and his shorter left leg. This was done by cutting the muscles in the left leg to allow growth, which produced a foot-drop on the left side. Prior to the time of the incident in question, he was mobile to the extent of being able to ride his bicycle and caddy on the golf course. The fact, if such it be, that he could out-run his companion on level ground is hardly conclusive that he could do so across open railroad ties on a trestle. The testimony of defendant's witness, Omar Kaufman, the brakeman on the train, is significant. He testified, "Well, we were all anxious to see the boys get away, get off. And of course the boy on the right got out of my sight, and I was hoping for the boy—looked as if the boy on the left [plaintiff] was crippled and having a hard time getting along with his bicycle, trying to carry his bicycle."

■ The jury could well have concluded from the evidence that plaintiff's ability to extricate himself from his perilous position was not on a par with that of his companion. Defendant's theory appears to be that plaintiff was under an absolute duty in this respect. While we find no case precisely in point, we think such is not the law. See Gamble v. Lewis, 227 Ind. 455, 464, 85 N.E.2d 629, cited with approval by this Court in Baker v. Pinkston, 314 F.2d 379, 381. It is not discernible how the doctrine of last

clear chance could ever be given effect if such a theory were approved. In our view, plaintiff would bear the same duty to extricate himself from his perilous position as would an ordinarily prudent man when confronted by a like emergency. We cannot hold as a matter of law that plaintiff under the circumstances shown could have freed himself from his perilous position.

In our view, the most crucial issue presented is whether defendant's employees upon discovering plaintiff's position of danger possessed the means to avoid the injury but negligently failed to exercise ordinary care to do so. On this point the Court instructed the jury:

"If you find that the person operating the defendant's train, after discovering the plaintiff in a perilous position on the bridge could, in the exercise of ordinary care, have stopped or slowed the speed of the train so as to avoid striking the plaintiff, but negligently failed so to do, then your verdict herein should be for the plaintiff. If, on the other hand, you fail so to find, then your verdict should be for the defendant."

As noted, defendant made no objection to the giving of this or any other instruction and is not in a position to raise any question here as to its correctness; in fact, it does not do so.

It is defendant's contention that its train crew, after discovering plaintiff's perilous position, used every possible means to avoid the accident. Fireman Smith, a promoted engineer, was operating the engine from the right or south side of the cab. Head brakeman Kaufman and engineer Snapp were riding on the left or north side of the cab. All three witnesses testified that upon discovery of plaintiff and his companion on the trestle, Smith immediately applied the emergency air brake and simultaneously sounded alarm blasts on the whistle. Referring to this testimony, the District Court in denying defendant's motion for directed verdict stated, " * * * there is evidence that the boys were seen, and

then the engineer testified that he immediately applied the brakes in full emergency. If the jury believes that, then it should find for the defendant; if it doesn't believe that, then it wouldn't have to. * * * There is certainly evidence from which the jury would not have to believe that the man [engineer] did what he said he did; in fact, they could infer quite the contrary." In this connection, the Court at defendant's request submitted to the jury the issue, "Did the engineer immediately apply emergency air upon observing plaintiff?" to which the jury by its special verdict answered, "No."

We think there is ample support for the Court's observation and the jury's special finding. Much evidence was offered by the respective parties as to the distance of the train from the west end of the bridge at the time the perilous position of plaintiff and his companion was discovered, the length of the bridge and the distance between the east end of the bridge where plaintiff was hit and the point where the train was brought to a stop. Also, there was testimony by expert witnesses who expressed their opinions as to the distance which would be required to bring the train to a stop. There is considerable conflict in the evidence on this phase of the case but, when considered in the light most favorable to plaintiff, the jury and the Court were justified in refusing to find that the emergency air was immediately applied.

The jury by its special verdict found that the engine was 150 to 300 feet from the west end of the bridge when plaintiff and his companion were discovered. This finding is quite favorable to defendant inasmuch as it had stated, in response to a special interrogatory, that the distance was from "300–500 feet." The bridge was 530 feet long, from which it follows, using the distance found by the jury, that the train was 680 to 830 feet from plaintiff and his companion when they were discovered. There is expert testimony, given in response to a hypothetical question, that the train could have been stopped within that distance. In fact,

defendant's conductor who was riding in the caboose at the time of the incident testified by deposition, "I would say he [the engineer] went maybe 500 feet before he stopped" after the air was applied. Defendant in response to an interrogatory stated that the train came to a complete stop "between 600 and 700 feet" from the place the brakes were first applied. It was shown by actual measurement that the train came to a stop 925 feet east of the point where plaintiff was struck.

Certainly the jury could have reasoned that the train traveled 1700 to 1800 feet from the point where the crew discovered plaintiff's perilous position to the point where it stopped. In view of the testimony as to the distance in which the train could have been brought to a stop after application of the emergency air brakes, the jury could have well found, as it did, that they were not applied immediately upon discovery of the perilous situation of plaintiff and his companion. More than that, an expert witness offered by defendant gave his interpretation of a device carried on defendant's train which recorded its speed. He testified, as did other of defendant's witnesses, that the train as it approached the bridge from the west was traveling at a speed of from 30 to 35 miles per hour. As stated on defendant's brief, "He testified that the tape showed the train speed to have been 34 miles per hour just prior to the accident. The witness testified specifically that restricting his answer to the distance along the track so far as the tape showed, between the 34 miles an hour speed and the point of no speed at all or a full stop, the train traveled in the neighborhood of 900 to 1000 feet."

Inasmuch as the train by actual measurement stopped 925 feet east of the point where plaintiff was hit, this testimony raises a strong inference that the air brakes were not applied until at or about that point. At any rate, it is not discernible how this testimony can be reconciled with defendant's contention that the air brakes were immediately applied upon discovery of plaintiff's perilous position.

On the issue as to whether defendant exercised ordinary care to avoid harm to plaintiff after discovering his perilous position, it is appropriate to keep in mind that defendant places sole reliance upon testimony that the emergency air brakes were immediately applied. On that question we conclude there was a submissible issue and that the record clearly reveals a sound basis for the jury's rejection of defendant's contention, as is evidenced by its special and general verdicts.

■ Defendant makes the point that the trial court abused its discretion in its refusal to allow defendant's motion for new trial based on the ground that the amount of damages awarded by the jury was excessive and motivated by passion and prejudice. We are not impressed with defendant's argument on this point. It is a fact, of course, as previously noted, that plaintiff had serious disabilities prior to the accident in issue, but they were confined to his left extremities. The injuries sustained in the instant case were to his right side. The jury found, in response to a question submitted on motion of defendant, that plaintiff's right leg and foot were normal prior to the accident. It would serve no purpose to set forth in detail the many and varied injuries which he sustained. It is sufficient to note that as a result of the accident he is totally physically incapacitated, helpless for the rest of his life. There is no basis for a conclusion on our part that the trial court abused its discretion in denying a new trial on the ground that the damages awarded were grossly excessive. See Flener v. Louisville & N. R. Co., 198 F.2d 77 (CA–7); Bucher v. Krause, 200 F.2d 576, 586 (CA–7).

We hold that the Court did not err in its refusal to deny defendant's motion for a directed verdict or in its denial of post-trial motions, including defendant's motion for new trial.

The judgment appealed from is

Affirmed.